757 A.2d 221

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. AMBROSE A. HARRIS, DEFENDANT–APPELLANT.

Argued March 14, 2000—Decided August 2, 2000.

304

*Frank J. Pugliese,* Assistant Deputy Public Defender and Claudia Van Wyk, Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Nancy A. Hulett,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

LaVECCHIA, J.

On February 20, 1996, a Burlington County jury convicted defendant Ambrose A. Harris of the purposeful or knowing murder by his own conduct and the felony murder of Kristin Huggins. The jury also convicted him of the related crimes of kidnaping, robbery, aggravated sexual assault, possession of a handgun for an unlawful purpose and various theft offenses. The jury sentenced defendant to death on the capital murder conviction. We affirmed the capital conviction and its accompanying sentence on direct appeal, reserving defendant's request for proportionality review for this separate proceeding. *State v. Harris,* 156 *N.J.* 122, 133, 716 *A.*2d 458 (1998). We now find no disproportionality in defendant's sentence of death.

## I. *FACTUAL BACKGROUND*

The facts of this case are set forth in *Harris, supra,* 156 *N.J.* 122, 716 *A.*2d 458. We draw from that opinion specific facts that are material to the proportionality review, expanding on our discussion as necessary.

On the morning of December 17, 1992, twenty-two year old Kristin Huggins drove her red Toyota MR2 sports car from her parents' home in Bucks County, Pennsylvania to the Trenton Club in downtown Trenton, New Jersey. She intended to paint a mural, but was never able to perform that task. When Huggins did not return home on December 17th, her parents immediately reported her missing.

Huggins' car, mud-covered and with its tires slashed, was found by authorities the next day. The news media reported on her disappearance, and a reward of $25,000 was offered for any information to assist in finding her. Huggins' body was eventually recovered in February 1993, approximately two months after she disappeared.

The investigation concerning Huggins' disappearance did not focus on defendant until January 1993. At that time defendant's nephew informed police that defendant had bragged to him about hijacking a red Toyota MR2 and having robbed and "knocked off some white girl." Defendant's nephew, as well as other witnesses, also reported that defendant was seen driving a red MR2 with a Pennsylvania license plate on the night of December 17th. Defendant's nephew even admitted to taking the red Toyota MR2 for a ride that night. In addition, a bank ATM security video showed, and bank records confirmed, that defendant attempted to withdraw $400 from Huggins' account on December 17th.

A major break in the investigation occurred in February 1993 when Gloria Dunn led police to the location of Huggins' body, claiming to have seen the body in a psychic vision. The body was badly decomposed. Dunn made numerous inquiries regarding the reward money in return for her information.

Eventually, however, the police learned that Dunn knew the location of Huggins' body because she was with defendant at the time of the murder. Dunn identified defendant as the murderer and provided numerous statements to the police concerning the circumstances surrounding the murder. Some of those statements were inconsistent. Also, Dunn failed to reveal, until approximately a year-and-a-half into the investigation, that defendant sexually assaulted Huggins. Nevertheless, she consistently implicated defendant as the triggerman who murdered Huggins. At trial, she featured as the State's eyewitness to the murder, providing the only direct evidence linking defendant to the crime.

To rebut Dunn's account, the defense focused on attacking her credibility based on inconsistencies in her testimony compared to

earlier statements made during the investigation. The defense highlighted Dunn's professed involvement in the crime, her failure to attempt to escape or to seek help for Huggins when she was presented with ample opportunity to do so, and her delay in reporting the murder to the police. The defense also attacked Dunn's credibility by reminding the jury that she received a reduction in charges in exchange for testimony against defendant. Defendant never testified.

The evidence presented to the jury may be summarized as follows. Dunn testified that in late November 1992, defendant asked her to join him in robbing a Trenton luncheonette. She agreed. They were to meet the morning of December 17, 1992, to carry out the holdup. That day, defendant arrived at 8:00 a.m. on bicycle at the agreed upon location, armed with a .22 caliber revolver. He and Dunn then set out to commit the robbery.

Dunn complained about the fact that it was raining that morning, so defendant said he would "carjack" someone to avoid walking in the rain. Dunn then asked what defendant would do with the person he carjacked and, in response, defendant said he would tie up and abandon a black victim, but would kill a white victim.[1]

As they approached the area of the Trenton Club, Huggins drove her red MR2 into the Club's parking lot. Defendant then said to Dunn, "I'm going to get that bitch," and on his bicycle he followed Huggins' car to the rear driveway of the Club. Dunn remained in the front area of the premises. Defendant returned, driving the car with Huggins sitting in the front seat. Dunn testified that defendant then ordered her into the front seat to sit with Huggins on her lap.

Defendant drove the red MR2 to a deserted area under the Southard Street Bridge in Trenton. Dunn testified that defendant was concerned about the appearance of two African–Americans

---

[1] Dunn did not make any statement of this nature during the investigation. This assertion was first made by Dunn during trial.

driving in a two-passenger sporty vehicle with a white female passenger. He asked Huggins to show him how to operate the front-trunk on the car. After her explanation, defendant told Huggins to get into the trunk of the car. He ignored her offer to sit on the floor of the back of the car, and instead forced her into the tiny trunk, where she was required to lie in a fetal position.

Defendant then drove back to the Trenton Club to retrieve his bicycle. This was corroborated by two workers at the Trenton Club who testified that they saw defendant at 9:15 a.m. walk to the rear of the parking lot and return with a bicycle. Throughout her confinement in the trunk of her car, Huggins pleaded for help. Huggins' pleas for help infuriated defendant. He commented to Dunn that he should have killed Huggins earlier.

Defendant drove the car back to the area under the Southard Street Bridge. He ordered Huggins out of the trunk and over to the passenger side of the car by the open door. While still outside the car, defendant ordered Huggins to take off her clothes. He ignored Huggins' cries for mercy because she was a virgin, and instead made derogatory comments to her during the sexual assault. According to Dunn, defendant anally raped Huggins, despite her pleas to stop because of the pain. Dunn testified that Huggins was crying and shaking very badly.

Defendant ordered Huggins back into the trunk. Dunn testified that defendant then contemplated his next act, eventually deciding that he would kill Huggins. He opened the trunk of the car and ordered her out of the trunk again. As Huggins tried to climb out of the trunk with Dunn's help, defendant shot Huggins in the back of her head using the .22 caliber revolver. Huggins had been a prisoner for approximately two hours by the time defendant shot her for the first time.

Defendant then dragged Huggins' body a short distance from the car to hide it under a discarded mattress located behind some bushes. He and Dunn then drove to defendant's mother's home to retrieve two shovels. When they returned to the crime scene, defendant proceeded to where he had hidden Huggins. He then

removed the mattress lying on top of her, shot her point-blank in the face to ensure that she was dead and threw the mattress back onto her body.

Defendant and Dunn then walked to a nearby area where they could dig a hole. They brought Huggins' body to the shallow grave they had dug, placed her in it face down and filled the grave with dirt. Defendant also threw some debris consisting of old clothes, rocks and a crate onto the grave site.

Before leaving, defendant went through Huggins' belongings taking $30 in cash and her ATM card. Testimony at trial revealed that defendant drove around in Huggins' car throughout the remainder of December 17, 1993. He tried to sell the car in New York City, but was unable to consummate the sale. As stated earlier, bank records and an ATM video revealed that defendant attempted to use Huggins' ATM card following her murder.

Huggins' disappearance was covered extensively by the news media. Despite having knowledge of the news coverage, Dunn did not immediately notify police about what she knew because defendant repeatedly threatened her that if she ever told anyone about what had happened, he would "come looking" for her and harm people that were close to her. She claimed that those threats delayed her from reporting the incident to the police. Defendant also told Dunn that he abandoned Huggins' car behind Mercer County Community College, with its tires slashed. He covered the car with mud to conceal any fingerprints.

Experts testified that Huggins died as a result of two gunshot wounds to the head. The prosecution's experts opined that Huggins may have lived as long as one hour after the first shot, or possibly ten to thirty minutes after the second shot. They noted that an autopsy found dirt in the victim's lungs. A defense expert rebutted that, testifying that she died immediately following the last shot. Dunn's testimony, however, supported the contention that Huggins did not die immediately.

Defendant was arrested ten days after the murder on an unrelated matter. At the time of the arrest, the .22 caliber pistol used during the murder of Huggins was found on defendant. Defendant was charged with kidnapping and sexual assault incidents involving four other women that had occurred both before and after the murder of Huggins.

A Mercer County Grand Jury returned an indictment on June 8, 1994, that charged defendant with purposely or knowingly causing the death of Kristin Huggins by his own conduct, felony murder, first-degree kidnaping, first-degree robbery, first-degree aggravated sexual assault, second-degree possession of a weapon for an unlawful purpose, third-degree theft, fourth-degree credit card theft and third-degree attempted unlawful use of a credit card. On July 1, 1994, the Mercer County Prosecutor's Office served notice of the following aggravating factors in support of a death penalty prosecution against defendant: (1) the murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by defendant; and (2) the murder was committed while defendant was engaged in the commission of, or attempt to commit, robbery and/or kidnaping and/or aggravated sexual assault.

Defendant requested a change of venue from Mercer County. Ultimately it was determined that the case would be tried to a jury selected from Burlington County. The trial commenced in January 1996. On February 20, 1996, the jury found defendant guilty on all counts.

In the penalty phase, the State relied only on the evidence that it had submitted during the guilt phase to support the two asserted aggravating factors. The defense submitted 180 mitigating factors concerning defendant's early childhood and the abuse he endured during his childhood. Presumably for strategic purposes, the defense decided not to address defendant's adolescent years during which he had compiled an extensive juvenile record. The trial court consolidated all those mitigating factors into one omnibus mitigating factor.

Three defense experts were offered during the penalty phase: a mitigating expert, a child psychologist and a psychiatrist. All concluded that defendant was raised in an extremely dysfunctional family environment. His mother was abused by his father. She had married defendant's father when she became pregnant, but he eventually abandoned the family. Defendant's mother neglected him, and she and her boyfriend physically abused him. The experts also testified that defendant was exposed to sexual activity at home. At a young age, defendant became involved in violent conduct and sexual activity, and experimented with drugs. School officials could not control his antisocial behavior. At one point, defendant was diagnosed as mentally retarded and institutionalized. A mood-elevating medication was prescribed.

One expert concluded that defendant had manifested a "rage against women" because of his experiences as a child. The expert relied on the fact that defendant was often neglected as a child and had experienced a great deal of difficulty in school, which eventually led to his institutionalization in a state mental hospital. The expert concluded that he should have been classified as having a "severe conduct disorder" at age thirteen.

Defendant admitted to drug use in his pre-sentencing reports, stating that he enjoyed smoking marijuana on a regular basis. Those reports also indicate that, from as early as 1970, defendant entered and re-entered the criminal justice system on a regular basis. He accumulated twelve convictions as an adult, spending less than one year out of prison during the entire period from 1974 to 1992.

Defendant has not shown any remorse for his actions. Throughout the trial, defendant acted with contempt toward all involved in this case, including his own attorney. He smirked at the State's witnesses while the jury was present. His lack of remorse was poignantly underscored during his non-capital sentencing hearing when, contrary to the court's repeated instructions, he addressed Mr. and Mrs. Huggins and told them they owed him an apology because of his conviction.

On the capital counts, the jury found beyond a reasonable doubt that the two aggravating factors outweighed the sole omnibus mitigating factor and sentenced defendant to death. On the remaining non-capital charges, defendant was sentenced to a consecutive sentence that totaled two life terms plus sixty-five years, with an eighty-two-and-a-half year parole disqualifier.

This Court affirmed defendant's conviction for capital murder and his death sentence, as well as his convictions and sentences for the non-capital charges. *Harris, supra,* 156 *N.J.* at 133, 716 *A.*2d 458. On direct appeal, defendant requested proportionality review pursuant to *N.J.S.A.* 2C:11–3e, and the issue was reserved for this separate proceeding. *Harris, supra,* 156 *N.J.* at 133, 716 *A.*2d 458.

## II. *INDIVIDUAL PROPORTIONALITY REVIEW*

The purpose and development of proportionality review generally, and in this State, was reviewed in *State v. Loftin,* 157 *N.J.* 253, 266–77, 724 *A.*2d 129 (*Loftin II* ), *cert. denied,* 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999). At the conclusion of the individual proportionality review in *Loftin II,* we determined that the proportionality review methodologies then in use were in need of review and reconsideration. *Id.* at 453–457, 724 *A.*2d 129. Accordingly, we appointed the Honorable David S. Baime as a Special Master to reexamine and make findings and recommendations relating to the proportionality methodology used by the Court since *State v. Marshall,* 130 *N.J.* 109, 613 *A.*2d 1059 (1992) (*Marshall II* ), *cert. denied* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). Judge Baime's report enabled the Court to reevaluate certain aspects of individual proportionality review. *In re Proportionality Review Project,* 161 *N.J.* 71, 735 *A.*2d 528 (1999) (*Proportionality Review I* ).

We reviewed Judge Baime's findings and recommendations and accepted most. We concluded that the universe of cases for proportionality review should include all defendants eligible for the death penalty, irrespective of a capital prosecution, as we had

concluded before. *Id.* at 84–87, 735 *A.*2d 528. We abandoned use of the index-of-outcomes test, *id.* at 91, 735 *A.*2d 528, but determined to continue frequency analysis through use of a modified salient factors test with fewer subcategories. *Id.* at 87–89, 735 *A.*2d 528.

This case is among the first of the proportionality reviews conducted by the Court in the wake of *Proportionality Review I.* As before, there remains a two-part framework for reviewing a death sentence to determine whether it is proportionate:

> The first part is frequency analysis, a statistical measure of the numerical frequency with which similar cases have resulted in sentences of death. The second part is precedent-seeking review, a traditional judicial way of comparing the files in similar cases to determine whether a defendant's death sentence is freakish or aberrational or the result of impermissible influences.

> [*Proportionality Review I, supra,* 161 *N.J.* at 77, 735 *A.*2d 528.]

Through proportionality review, we seek to determine "whether a particular death sentence is aberrational, not whether it compares perfectly with other sentences." *State v. Bey,* 137 *N.J.* 334, 352, 645 *A.*2d 685 (1994) (*Bey IV*), *cert. denied* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995) (citing *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059). Showing that it is disproportionate is the defendant's burden. *State v. DiFrisco,* 142 *N.J.* 148, 162, 662 *A.*2d 442 (1995) (*DiFrisco III*).

## A. *Universe of Cases*

As a threshold issue, the "universe of cases" for purposes of comparison to defendant's case must be determined. All death-eligible cases are considered, whether or not they were capitally prosecuted, because the decision not to prosecute capitally "*is not necessarily* a reflection on [the] defendant's lack of deathworthiness." *State v. Harvey,* 159 *N.J.* 277, 292, 731 *A.*2d 1121 (1999)(emphasis added)(*Harvey III*). Once the universe of cases is determined, proportionality review may begin.

■ Thirteen basic categories have been created that differentiate capital murder cases based on statutory aggravating factors. The thirteen categories are:

(A) Victim is a Public Servant;

(B) Prior Murder Conviction without A above;

(C) Contract Killing without A–B above;

(D) Sexual Assault without A–C above (subdivided into (1) aggravated and (2) other);

(E) Multiple Victims without A–D above (subdivided Into (1) aggravated and (2) other);

(F) Robbery without A–E above (subdivided into (1) home, (2) business, and 3 other);

(G) Torture/Depravity without A–F above;

(H) Abduction without A–G above;

(I) Arson without A–H above;

(J) Escape Detection without A–I above;

(K) Burglary without A–J above;

(L) Grave Risk without A–K above;

(M) Victim Under 14 Years Old without A–L above.

Certain groups are subdivided by criteria that attempt to distinguish the murder based on "circumstances that serve either to aggravate or to mitigate the blameworthiness of the defendants in those cases." *Loftin II, supra,* 157 *N.J.* at 328, 724 *A.2d* 129 (quoting *State v. Martini,* 139 *N.J.* 3, 33, 651 *A.2d* 949 (1994) (*Martini II* ), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.2d* 137 (1995)); *see Harvey III, supra,* 159 *N.J.* at 301, 731 *A.2d* 1121. In *Proportionality Review I,* we adhered to the principle of unique assignment in the salient factor review. "[T]he principle is that even though a case may contain multiple identifying factors, *e.g.,* killing a public official and robbing or torturing the official, the case is assigned to one category for salient-factor review." *Proportionality Review I, supra,* 161 *N.J.* at 89, 735 *A.2d* 528.

Where the principal salient factor in a death-eligible murder is a sexual assault, the Administrative Office of the Courts ("AOC") has classified such cases as "D" category homicides. Defendant's case falls into that category. Judge Baime has recommended subdividing the D category for purposes of analysis into two

categories: aggravated killings (D–1 category) and non-aggravated killings (D–2 category). *Proportionality Review I*, 161 *N.J.* at 88, 735 *A.*2d 528. The recommendation was to distinguish sexual assault murders committed with "particular violence or terror" because juries and prosecutors tended to view such defendants as more deathworthy. *Id.* at 88, 735 *A.*2d 528. Generally, cases that fall within the D–1 aggravated category include murders that involve multiple wounds from a gun, knife or physical beating, murders that involve mutilation or wounds intended to cause pain, and murders involving a minor victim. Judge Baime emphasized the need for strict guidelines when distinguishing among those cases so as "to avoid the inherent subjectivity in defining" the subcategories.

In furtherance of that objective, the AOC in December 1999 proposed a typology to distinguish between the D–1 and D–2 categories:

> *Category D–1*—Includes cases in which the victim suffers multiple wounds, such as multiple stab wounds, multiple gunshot wounds or multiple blows to the head. Also includes cases in which the victim suffers multiple *types* of wounds, such as those resulting when the victim is beaten, stabbed, and then strangled or suffocated. Beatings in this category typically result in death, unconsciousness, fractured bones, and/or internal injuries. Also includes cases in which the defendant inflicts pain, rather than death. Examples include, but are not limited to, cases which involve stab wounds to the genital area, cigarette (or similar) burns, injuries to the victim's eyes, injuries caused by biting, or wounds which a Medical Examiner can attest were intended to cause pain. Also includes cases in which the [ ] victim was under the age of 14, regardless of the victim's injuries or cause of death. *Category D–2*—Includes cases in which the victim suffers a single fatal wound, such as a stab wound to the heart, a slit throat, or a gunshot wound to the head. Also includes cases which involve a single cause of death, with no contributing injuries. Beatings in this category typically result only in isolated bruising or minor lacerations, and are generally intended to subdue, rather than harm, the victim.

In this matter, the AOC has assigned defendant to the D–2 category stating the victim was not under the age of fourteen when she was killed, and because she suffered only "a single fatal wound" with no other contributing injuries.

When we reviewed Judge Baime's recommendations in *Proportionality Review I*, we agreed that the frequency analysis should

consist only of the salient-factors test, and that that test should be modified to contain fewer subcategories. 161 *N.J.* at 87–89, 735 *A.*2d 528. Only a few discrete subcategories were recommended for retention; one of them was the sexual assault classification. *Id.* at 88, 735 *A.*2d 528. We did not object to the recommendation to subdivide the sexual assault category of cases when we adopted Judge Baime's general recommendations improving on the salient-factors test in *Proportionality Review I*, 161 *N.J.* at 87–88, 735 *A.*2d 528. But the instant matter highlights the difficulty with attempting to subcategorize cases within this classification of death-eligible cases.

Trying to create objective criteria that *consistently* distinguish among sexual assault murders on the basis of the degree of particular violence and terror is problematic. Cases of this nature inherently involve subjective factors, particularly when the determinative linedrawing is supposed to focus on *"particular violence or terror"* (emphasis added).

We are unconvinced that the AOC's assessment of this matter, assigning it to the "non-aggravated" subcategory of D–2, correctly reflects the degree of "particular violence or terror" defendant inflicted on Huggins. We believe defendant's case is more similar to the cases that fall within the D–1 category than D–2. The evidence militates in favor of a conclusion that Huggins did not die quickly from a single gunshot to the head. She suffered as a terrorized prisoner of the defendant for approximately two hours. She was brutalized in the sexual assault and she did not die from a single gunshot wound to the head. She likely died sometime after the later second gunshot wound to her face.

The facts of this case appear to fit more appropriately in the D–1 subcategory. However, we need not so conclude because both parties here agree that the D category cases should be consolidated for purposes of reviewing defendant's case. That approach is more compelling under the circumstances because of our view of the questionable appropriateness of the D–2 category and because the D–2 category has so few cases with which to compare defen-

dant. To perform a complete analysis of defendant's murder, consolidation of the entire D category offers a more appropriate sampling of cases like defendant's to assess deathworthiness. Accordingly, we will compare the facts of defendant's case to those similar cases within the D category as a whole.

## B. *Frequency Analysis*

 Frequency analysis is the first step in the proportionality review process. *Proportionality Review I, supra,* 161 *N.J.* at 77, 735 *A.*2d 528. Through its simple statistical methodology, it helps us determine whether the frequency of death sentences in similar cases involving defendants with similar culpability supports a determination that the death penalty sentence in the case before us is not aberrational. *State v. Chew,* 159 *N.J.* 183, 201–02, 731 *A.*2d 1070 (1999) (*Chew II* ). The salient-factors test allows the Court to compare the case under review with other similar cases, and to distinguish those cases by their most salient factor, i.e., the fact that would most likely influence the decision to sentence a defendant to death.

Turning to the raw data for the frequency with which the death penalty is imposed, we will review both the D category of cases and all death-eligible cases. The following chart summarizes that data when defendant's death sentence is included and excluded:

| PRINCIPAL SALIENT-FACTORS AND THE NUMBER OF CASES | CASES THAT PROCEEDED TO THE PENALTY PHASE | CASES AT THE PENALTY PHASE WHERE THE DEATH PENALTY WAS IMPOSED | DEATH-SEN-TENCING RATE AMONG ALL DEATH-ELIGIBLE CASES |
|---|---|---|---|
| **D. Sexual Assault** | | | |
| 59 Death Eligible Cases | 44% $(^{26}/_{59})$ | 35% $(^{9}/_{26})$ | 15% $(^{9}/_{59})$ |
| Exclude Harris | 43% $(^{25}/_{58})$ | 32% $(^{8}/_{25})$ | 14% $(^{8}/_{58})$ |
| **D–1. Aggravated Sexual Assault** | | | |
| 47 Death Eligible Cases | 49% $(^{23}/_{47})$ | 35% $(^{8}/_{23})$ | 17% $(^{8}/_{47})$ |
| Exclude Harris | 48% $(^{22}/_{46})$ | 32% $(^{7}/_{22})$ | 15% $(^{7}/_{46})$ |
| **D–2. Other Sexual Assault** | | | |
| 12 Death Eligible Cases | 25% $(^{3}/_{12})$ | 33% $(^{1}/_{3})$ | 8% $(^{1}/_{12})$ |
| Exclude Harris | 18% $(^{2}/_{11})$ | 0% $(^{0}/_{2})$ | 0% $(^{0}/_{11})$ |
| **All Death–Eligible Cases** | | | |
| 455 Death Eligible Cases | 39% $(^{176}/_{455})$ | 30% $(^{52}/_{176})$ | 11% $(^{52}/_{455})$ |
| Exclude Harris | 39% $(^{175}/_{454})$ | 29% $(^{51}/_{175})$ | 11% $(^{51}/_{454})$ |

The salient-factors test demonstrates that category D cases are considered more "deathworthy" than most of the other death-eligible categories. Sexual assault cases (Category D) proceed to penalty phase at a higher percentage (44%) than the overall average for death-eligible cases (39%). Accordingly, proceeding to the death penalty phase is not aberrational. The test also reveals that the death-sentencing rate in Category D, fifteen percent, is slightly greater than the eleven-percent death-sentencing rate of the 455 cases in the full universe of death-eligible cases. Thus, sexual assault cases are more likely to involve prosecutions that seek the death penalty and are more likely to have a death sentence imposed.

When defendant's death sentence is excluded, the numbers do not change significantly, except in the D–2 category. Defendant is the only defendant in the D–2 category to have been sentenced to death. That fact is accentuated by the small number of cases in the D–2 category. However, as previously stated we are unpersuaded that defendant is more similarly situated to D–2 defendants than defendants in the D–1 subcategory, and for purposes of this analysis we are considering the D category as a whole. In neither the D category nor the D–1 subcategory do the numbers change significantly when defendant is excluded. We note also that in the cases that proceeded to the penalty phase in both the D–1 and D–2 subcategories, including defendant's sentence, the death penalty was imposed in roughly a third of the cases.

As applied, the salient-factors test demonstrates that defendant's death sentence is not disproportionate. The imposition of a death sentence in this case is consistent with other cases in which no disproportionality was found. *See State v. Morton*, 165 *N.J.* 235, 245–48, 757 *A.2d* 184 (2000) and cases cited therein. Even though the death-sentencing rates in D category cases are similar to the overall death-sentencing rates, evidencing no disproportionality in this part of our analysis, nevertheless we turn to precedent-seeking review, to which, in prior proportionality re-

views, we have accorded greater weight than frequency review. *State v. Cooper,* 159 *N.J.* 55, 88, 731 *A.*2d 1000 (1999) (*Cooper II* ); *see also Harvey III, supra,* 159 *N.J.* at 308, 731 *A.*2d 1121 ("We have consistently placed greater reliance on precedent-seeking review than on frequency review."); *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.*2d 442; (same); *Chew II, supra,* 159 *N.J.* at 209, 731 *A.*2d 1070 (acknowledging reliance on precedent-seeking review); *Loftin II, supra,* 157 *N.J.* at 296, 724 *A.*2d 129 ("We have consistently placed our reliance on [precedent-seeking] review because of the analytic difficulties we have encountered in applying frequency analysis.").

## C. *Precedent–Seeking Review*

In precedent-seeking review, "we examine death-eligible cases similar to defendant's case to determine whether his death sentence is aberrant when compared to the sentences received by defendants in those other cases." *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070; *accord Cooper, supra,* 159 *N.J.* at 70, 731 *A.*2d 1000.

### 1. *Relevant Factors*

█ The first step of precedent-seeking review requires examination of defendant's criminal culpability. Three major considerations guide our analysis: (a) defendant's moral blameworthiness, (b) the degree of victimization associated with defendant's conduct, and (c) defendant's character. *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070; *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059.

### (a) *Defendant's Moral Blameworthiness*

█ In reviewing a defendant's moral blameworthiness, we examine factors that include

motive, premeditation, justification or excuse, evidence of mental defect, or disturbance, knowledge of helplessness of the victim, defendant's age or maturity level, and defendant's involvement in planning the murder.

[*Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129 (citing *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059).]

Consideration of those factors in the instant matter reveals that defendant is highly blameworthy.

Huggins' murder was coldly pre-meditated. Defendant was determined to find a vehicle to carjack so that he could get out of the rain and drive to the business he wanted to rob. Once he carjacked Huggins, he told Dunn on two separate occasions that he was going to kill her. Huggins was terrorized for two hours as defendant's prisoner. Despite being categorized as a sexual assault murder, this murder did not occur in the tumult of a sexual assault. It was part of a more lengthy terrorization and culminated in a calculated shooting. During this ordeal, defendant confined Huggins to the cramped, small trunk of her own car while he drove around Trenton. She was allowed out only twice—once to be sodomized and later to be shot. The cold-bloodedness and brutality of defendant are evidenced by the fact that defendant specifically asked Dunn to watch him kill Huggins.

Defendant's motivation for killing Huggins add to his highly blameworthy status. The jury specifically found that defendant killed Huggins to escape detection, apprehension, trial, punishment or confinement. Although we do not rely on it to support our finding that defendant is highly blameworthy, we also note defendant's own words to the effect that he would kill the person whose vehicle he carjacked if the victim were white.

There is no evidence of justification or excuse present in this case. Huggins did not provoke defendant to a sudden intemperate act. Nor did he kill her in the midst of violent sexual frenzy. To the contrary, for two hours she was a helpless victim of a cool and deliberate carjacker. The rape was part of the latter end of her abduction. Defendant was aware of how helpless Huggins felt. In fact, defendant took affirmative steps to ensure that she would feel helpless. He carjacked her at gunpoint and then locked her in the small trunk of her car. When she was later released from the trunk, she found herself in an isolated and unfamiliar area. Then, defendant sexually assaulted Huggins despite her pleas for mercy, which only could have contributed to

Huggins' existing feelings of despair. Dunn did not offer any assistance because of her own fear of defendant. During Huggins' final hours, she was alone and could not take any steps to alleviate her feeling of helplessness.

Turning to the defendant's mental state, three experts testified during the penalty phase. Their review was limited to defendant's mental condition as a young child presumably because the defense did not want the jury to have specific knowledge of his criminal record. The experts concluded that defendant was mentally disturbed because of his childhood experience. Two experts specifically concluded that as a child he suffered from "severe conduct disorder."

The experts noted that defendant grew up in a severely dysfunctional family environment. He witnessed his mother being abused by his father. His father abandoned the family when defendant was very young. Defendant's mother neglected her son's needs as a child, and allowed him to be exposed to situations that were both physically and mentally abusive. Defendant eventually engaged in violent and sexual activity while still a boy. School records, beginning as early as kindergarten, indicated that defendant exhibited severe behavioral problems. When such issues were brought to his mother's attention, she shifted blame to the school system and failed to take appropriate steps to deal with her son's mental problems. The school had defendant evaluated by a psychiatrist when he was nine years old. It was recommended that defendant attend therapy, but his mother did not see to it that those therapeutic needs were met.

By age twelve, the court stepped in and institutionalized defendant. Doctors at Trenton State Hospital determined that he suffered from mild retardation and adjustment reaction to childhood. He was released to his mother's custody after an initial thirty-day evaluation, but was committed five months later pursuant to another court order. Defendant continued to be disruptive while in the children's psychiatric center, so he was transferred to the adult section of the hospital. His behavior improved once he

was placed on a daily regime of Thorazine. Although the hospital recommended otherwise, defendant was released to the custody of his mother a year later.

Despite this poor childhood and resulting debilitating effects on defendant, the evidence was not persuasive that defendant should be relieved of his culpability for his acts involving Huggins. We note specifically that the experts focused only on defendant's early youth, a long time distant from the facts that determine his moral culpability for his December 17, 1993 actions. In fact, we find that there is nothing mitigating about defendant's age or level of maturity at the time of the murder. He was forty-one years old at the time, old enough to know right from wrong. Further, because of his previous experience with the criminal justice system, defendant knew that there would be criminal consequences for his actions. No alcohol or drug induced diminishment of his cognitive functions affected his judgment that morning. Defendant was stone-cold sober when he abducted, viciously raped and murdered a victim who just happened to cross his path, driving a vehicle he decided to carjack. He is highly blameworthy.

(b) *Degree of Victimization*

To determine the level of victimization endured because of defendant's conduct, we consider the "violence and brutality of the murder," as well as the "injury to nondecedent victims." *Chew II, supra,* 159 *N.J.* at 210–11, 731 *A.*2d 1070 (citing *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059). Again, we find defendant's criminal culpability to be high because this review demonstrates that the murder of Huggins was violent and brutal.

Huggins was terrorized for over two hours while being abducted, raped and shot by defendant. She was confined to the small trunk compartment of her car during a good portion of this ordeal. Defendant raped Huggins despite the fact that she pled for mercy. Defendant then forced Huggins back into the trunk of the car after her vicious sexual assault. Deciding it was time to kill Huggins, defendant asked Dunn to watch, opened the trunk and

shot Huggins in the back of the head as she attempted to crawl out of the trunk, not knowing what defendant was going to do to her next. All experts agreed that Huggins survived after being shot in the head once. She was dumped in a lot littered with refuse, and a discarded mattress was thrown on top of her. Forensic evidence presented at trial would support a jury finding that she survived from ten to thirty minutes after being shot by defendant again when he returned. The review of the totality of Huggins' last two hours alive lead to the conclusion that her victimization was high. In large part, the heinousness of defendant's crime is heightened by his terrorizing of his victim throughout her abduction until her death.

### (c) *Character of Defendant*

Finally, we must examine the character of the defendant by looking at his "prior record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation." *Chew II, supra,* 159 *N.J.* at 210–11, 731 *A.*2d 1070 (citing *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059). In light of the fact that defendant had spent less than a year out of prison over a span of twenty years, and because he has shown ·no remorse for his actions, consideration of defendant's character only heightens our overall view of his criminal culpability.

Defendant has an extensive prior criminal record. As a juvenile, he was arrested for malicious mischief, assault and battery, petty larceny, violation of probation, running away from home, and purse snatching. As an adult, he had seven prior indictable convictions and twelve convictions in total. The gravity of defendant's arrests as an adult escalated through the years. He had been arrested for receiving stolen property, trespass, assault, shoplifting, larceny and robbery earlier in his criminal career. More recent offenses have included armed robbery, weapons offenses, assault and battery on a police officer, arson, and aggravated assault.

While in prison, defendant committed more than one hundred infractions that included sexually assaulting inmates, threatening

corrections officers and physically attacking inmates. He had been out of prison for only five months before he killed Huggins, and was arrested ten days after the Huggins murder for four separate incidents of aggravated sexual assault and kidnaping that occurred *immediately before and after* Huggins' murder.

Defendant proclaimed his innocence throughout the proceedings of this case. He blames society and the victim's family for being prosecuted for the murder of Huggins. Rehabilitation is not a realizable goal.

### (d) *Conclusion*

All three categories show that defendant's overall culpability is high. Defendant took affirmative and deliberate steps to carry out the murder of Huggins. Although childhood mental disorder was documented, that history is substantially outweighed by other factors that demonstrate defendant's high level of moral blame-worthiness. The amount of victimization associated with this crime is significant and there are no redeeming qualities about defendant's character. Accordingly, we find defendant's criminal culpability to be high.

### 2. *Defendant's Comparison Group*

Precedent-seeking review requires the examination of cases factually similar to defendant's case to determine "[w]hether defendant's sentence is disproportionate in comparison with the culpability levels of the comparison group." *Loftin II, supra,* 157 *N.J.* at 339, 724 *A.*2d 129. Generally, we "employ[ ] the same comparison group as that used in the salient-factors test" when conducting precedent-seeking review. *Chew II, supra,* 159 *N.J.* at 214, 731 *A.*2d 1070.

We start with the D category, as a whole, to determine the cases that are most similar to the facts of defendant's case.[2] The

---

[2] The cases offered by the State and by the Public Defender for purposes of precedent-seeking review are discussed at length in Appendix A.

parties agree on fifteen cases for our review: Bey, Cunningham, Dennis(2), Dickerson, E. Edwards, Johnson, Marrero, Mincey, Prater, Reese, Rivera, Spraggins, Thomas, J. Williams and Zola.[3] Defendant proposes an additional twelve for the Court to consider: Bolinger, Brockington, Chippero, Clowney, Dennis(1), R. Edwards, James, Koedatich, Luciana, Muhammad, Norris and G. Williams. In comparison to both groups, defendant asserts that he is less "deathworthy" than the other defendants because there was less victimization associated with the killing of Huggins.

"[T]he ultimate decision concerning which cases are to be considered for precedent-seeking review" remains within the province of this Court. *Proportionality Review I*, 161 *N.J.* at 91, 735 *A.*2d 528. Except as noted hereinafter, we accept and will examine all agreed-upon cases and the additional twelve cases proposed by defendant.

We find that the cases presented for our review fall into five distinct categories, and we will use these categories for ease of comparison. Category (1) discusses cases in which the death penalty was imposed. Category (2) includes cases in which the State did not seek the death penalty. Category (3) addresses cases in which the defendant pled guilty. Category (4) includes cases in which the defendant was not convicted of murder. Finally, category (5) discusses cases in which the death penalty was not imposed in the penalty phase. From our review of all of the cases in each category identified above, we find that defendant's factual situation is most similar to the cases presented in category (1).

### Category (1)

The prosecutions of Marko Bey, James Williams and James Zola comprise category (1). Turning first to J. Williams and Zola, in both the juries imposed the death penalty. This Court then reversed those sentences. *State v. Zola*, 112 *N.J.* 384, 548 *A.*2d 1022 (1988) (remanding for second penalty trial because court

---

[3] Of the agreed upon cases, Marrero and Spraggins fall in the D–2 category. The remaining thirteen are in the D–1 category.

failed to instruct jury that it must find that aggravating factors outweigh mitigating factors beyond reasonable doubt when charging jury during first penalty phase); *State v. Williams*, 113 *N.J.* 393, 550 *A.*2d 1172 (1988) (finding that combination of inadequate questioning during *voir dire* and failure of trial judge to dismiss prospective juror for cause required reversal of guilt and penalty proceedings). On remand, J. Williams and Zola both pled guilty and received life sentences.

For purposes of our proportionality review, we start with the fact that the actions of J. Williams and Zola were found to be punishable by death by two separate juries. In comparison to both cases, Harris is equally, if not more, deathworthy.

Harris' case is similar to the cases of J. Williams and Zola because in each the victim was murdered, sexually assaulted and robbed. However, Williams and Zola may be regarded as "less deathworthy" than Harris because evidence was presented at their trials that demonstrated that both Williams and Zola were severely intoxicated when committing their crimes. In contrast, no evidence was presented that suggested Harris was intoxicated or under the influence of drugs when he carjacked, sexually assaulted and murdered Huggins. Harris was sober, thoughtful and deliberate throughout the two hours of Huggins' victimization and murder.

Further, in Zola, there was only circumstantial evidence of a sexual assault. The sexual assault was clearer in Harris' case. Finally, more extensive mitigating evidence was presented on behalf of both J. Williams and Zola than that presented for Harris and the jury found Zola to be under the influence of extreme emotional disturbance. In comparison to J. Williams and Zola, Harris is equally or more deathworthy. His death sentence cannot be regarded as aberrational since they, like he, received jury-imposed death sentences.

Review of Bey's case also supports the conclusion that Harris' sentence is not disproportionate. Like Harris, Bey kidnaped and robbed his victim. Arguably the victimization level in Bey's case

is higher because Bey effectively "stomped" his victim to death. However, the two hours of abduction, imprisonment and assault Huggins endured leading up to her shooting should not be over-looked when comparin the two cases. After being carjacked, she was forced into the small trunk of her car, only to be released for purposes of Harris' sexual gratification. She was then forced back into the claustrophobic compartment before he eventually shot her once. Evidence at trial indicated that she may have lived for some time even after the second gunshot in the face. In between these two shootings, she was dragged some distance to be left in an isolated area on the ground with a mattress thrown over her. The level of victimization endured by Huggins is comparable to the victim in Bey's case.

Also, more mitigating evidence was presented in Bey's case than was presented for defendant. Although both Bey and Harris were neglected as children, two family members testified about Bey's family and childhood, including his abuse of drugs and alcohol. His mother placed on herself the blame for her son's conduct. *State v. Bey II*, 112 *N.J.* 123, 147, 548 *A.*2d 887 (1988). Unlike Harris, Bey was severely intoxicated when he committed the crime. We also note that Bey was barely old enough to be eligible for the death penalty when he murdered his victim. Nevertheless, the jury imposed the death penalty for Bey as it did for Harris. Thus, Harris' sentence, when compared to Bey's, is not aberrant.

To summarize, when considering similar cases in the D category where the death penalty was imposed, Harris' sentence is not disproportionate. He is equally deathworthy, if not more so, than Bey, Zola and J. Williams, all of whom received the death penalty.

### Category (2)

We include in category (2) the two cases in this universe of cases in which the State did not seek the death penalty: Sam Mincey and Sharob Clowney. Both Mincey and Clowney were addressed in *Cooper II, supra*, 159 *N.J.* at 99–101, 731 *A.*2d 1000.

Defendant Samuel Mincey beat, raped and strangled a seventy-three-year-old woman, and stole her belongings. He was prose-

cuted six years later for that murder when police identified one of the victim's belongings during the investigation of a separate crime. A jury convicted him of murder and felony murder.

Unlike in Harris, the prosecutor in Mincey did not pursue that matter as a capital case. We noted in *Cooper II, supra,* 159 *N.J.* at 98, 731 *A.2d* 1000, that our review of the prosecutor's decision to forego a capital case against Mincey was hindered. The AOC's summary surmises that the prosecutor in Mincey may have concluded that the statute of limitations barred reliance on any aggravating factor that could have provided a basis for a capital prosecution. *Id.* at 101, 731 *A.2d* 1000. There has been no further elucidation on this point. Accordingly, we adhere to the AOC's seemingly correct assessment that there were legal impediments to mounting a capital prosecution against Mincey. There was no similar impediment in the instant matter. Indeed, the jury found both aggravating factors offered by the State against Harris to be present. Mincey does not demonstrate that defendant's death sentence is disproportionate.

Sharob Clowney was convicted of murder, felony murder, aggravated sexual assault, two counts of attempted murder, and various possessory offenses. He received an aggregate sentence of life plus twenty years with a forty-year term of parole ineligibility. We have previously cited Clowney's history of emotional instability and evidence suggesting that the victim may have purchased drugs from defendant in our identification of those factors likely to have influenced the prosecutor's decision to forgo a capital prosecution. *Id.* at 99, 731 *A.2d* 1000. Unlike Clowney, the evidence of Harris' mental instability at the time of the murder was not well documented at trial, thus there was no similar impediment to pursuing the death penalty for him. Reliance on Clowney is also undermined by the fact that, unlike Harris, he was not convicted of kidnaping or robbery. The case is dissimilar.

The Mincey and Clowney cases provide little assistance for this proportionality review. In each, there appears to be a readily

inferable basis for deciding to forego capital prosecution. In this case, there were no similar reasons to forego pursuit of a capital prosecution. Thus, reliance on the Mincey and Clowney cases does not support a conclusion that Harris' case is disproportionate.

### Category (3)

We turn next to those cases in which the defendant pled guilty instead of withstanding a capital prosecution. Category (3) includes the following cases: Jerome Dennis(2), Eugene Edwards, Robert Bolinger, and Otis James. The parties agreed only to Dennis(2) and Edwards for purposes of proportionality review. The Public Defender offered Bolinger and James. We will review all.

We find that the Bolinger and James cases are dissimilar in nature to Harris' case and the decision of the prosecutor to accept a guilty plea in lieu of pursuing a capital prosecution in each is easily reconcilable with the prosecutor's decision to pursue and the jury's decision to impose the death sentence for Harris. Both Bolinger and James were heavily intoxicated on the day that they committed the murder for which each was prosecuted. Both also had a well documented history of mental defect and had diminished capacity at the time of the crime. Bolinger was a Vietnam veteran who was addicted to drugs and alcohol and who became intoxicated daily. He was burglarizing his victim's apartment when she came home. While he tried to get away, the victim saw him. He attacked, sexually assaulted, and killed her. The impulsive nature of the murder, coupled with Bolinger's history of drug and alcohol use, may have influenced the prosecutor's decision to accept his guilty plea.

James also was a daily drug and alcohol abuser. He was heavily intoxicated on the day he entered the home of his victim and sexually assaulted and murdered her. More importantly, there was a documented history of attempted suicide and adult psychiatric hospitalization. Unlike Harris, there was no kidnaping or robbery involved in James' case. Because both Bolinger and James are distinguishable from Harris due to their demonstrated

diminished capacity at the time of their murders, they are both less deathworthy than Harris.

Turning to Dennis and Edwards, both appear as deathworthy as Harris. Dennis tied up his victim, raped her and then stabbed her to death. To dispose of her body, he wrapped it up in carpeting and rolled it down a hill. Edwards participated in the rape of his prostitute victim with his co-conspirator, Michael Prater. They had lured her to Edwards' home with a promise of drugs in exchange for sexual relations. When Prater unsuccessfully tried to kill the victim by stabbing her, Edwards suffocated her while Prater stabbed her an additional three or four more times.

Dennis had been charged with committing four other homicides at the time that he entered a plea of guilty. In one of the murders he claimed to have been influenced by a "demon." He may have been reasonably concerned that the other prosecutions would have been considered aggravating factors that would have resulted in a death sentence. Thus, the advantage of pursuing a plea agreement may be reasonably inferred for Dennis. He was sentenced to two consecutive life terms with a thirty-year term of parole ineligibility, and two concurrent life terms that each included a thirty-year term of parole ineligibility. No explanation for the prosecution's decision to forego a capital prosecution may be inferred from the AOC summaries.

Edwards confessed to the police. He had no prior record and no history of drugs or alcohol abuse. He was a co-conspirator in the murder of his victim, but did not initiate the killing. He joined in after Prater first stabbed the victim. His confession and agreement to provide testimony needed for the prosecution of his co-conspirator, as well as the fact that the homicide began with an apparent agreement to exchange drugs for sexual relations, may well have influenced the prosecutor's decision to accept a guilty plea to a noncapital charge.

Notwithstanding our inability to understand the reasons for the prosecutor's decision in Dennis, we do not find that the life sentences imposed in the Category (3) cases render Harris' death

sentence aberrational. The one unexplainable prosecutorial decision in Dennis does not cause Harris' capital prosecution to be disproportionate. As for Bolinger, James, and Edwards, the mitigating factors of diminished capacity at the time of the crime, documented evidence of mental defect, and the confession and testimony against a co-conspirator provide ample reason for distinguishing those cases from Harris. We find no disproportionality in Harris' death sentence as a result of those cases.

### Category (4)

We next consider category (4), which includes cases where the defendants were not found guilty of murder. Defense counsel proposed the two cases that fall in this category: Founcill Brockington and Walter B. Norris. Both cases are facially dissimilar from Harris' case because, like so many other cases proposed by defendant, defendants Brockington and Norris were not charged with kidnaping or robbery.

Brockington sexually assaulted and strangled his thirty-four-year-old victim in her home. The AOC summary is vague about whether Brockington and the victim knew one another or were strangers. This ambiguity about the origins of the encounter between the victim and Brockington may have affected the prosecutor's decision to proceed non-capitally and accept Brockington's plea to aggravated manslaughter. In addition, Brockington had no prior criminal record and claimed to have been a regular cocaine user for a year or two prior to the homicide.

The origins of the encounter between Norris and his victim are also ambiguous. A security guard witnessed Norris kicking "something" which turned out to be a naked bleeding woman lying on the ground. She died of multiple injuries to her face and head. A condom was found at the scene. Norris was charged with murder and three counts of aggravated sexual assault. He was convicted of aggravated manslaughter and sentenced to thirty years with a fifteen-year parole ineligibility term. All other charges were dismissed.

Like Brockington, Norris did not have a background remotely resembling the terrible character of Harris. Norris had a well-documented history of mental illness, including institutionalization while an adult. The murders of both Norris' and Brockington's victims occurred as part of a violent sexual exchange. With Harris, murder was a calculated act during a two-hour abduction over the course of which he engaged in a brutal sexual act as a terroristic aside to his theft of Huggins' car and his abduction and eventual shooting of her. Those two cases, Brockington and Norris, are distinguishable from Harris' case. They do not support a finding that Harris' sentence is disproportionate.

### Category (5)

Category (5) includes those cases within Harris' universe of cases in which the jury did not impose the death penalty. The parties agreed to the following cases that fall within category (5): Bruce Cunningham, Keith Dickerson, Scott Johnson, Adam Marrero, Michael Anthony Prater, John Seymour Reese, Rafael Rivera, Jerry Spraggins and Christopher Thomas. Defendant also offered a number of cases that are found in category (5): Richard Chippero, Ralph Edwards, James Koedatich, Mark Luciana, Rasheed Muhammad and Gerald Williams.

We first note that both R. Edwards and Muhammad murdered children. Defendant has conceded that those two cases should not have been included in the cases presented for proportionality review. We agree, and accordingly do not consider either case further. We also will not consider the Koedatich case. We have already held in *Cooper, supra*, 159 *N.J.* at 76–77, 731 *A.*2d 1000, that defendant James Koedatich should not have been assigned to the sexual assault-murder category. We specifically found that

[a]lthough in its prosecution of Koedatich for murder and kidnaping the State alleged as aggravating factors that defendant murdered the victim in the course of a sexual assault, as well as to escape detection for sexual assault, the jury found neither of those aggravating factors.

[*Id.* at 76, 731 *A.*2d 1000.]

Therefore, during the final stage of precedent-seeking review, we focus only on those cases the parties agreed to, as well as the

three remaining cases offered by defendant: Chippero, Luciana and Williams. Within this universe of cases we first note that juries have imposed a life sentence twelve times (category 5), and imposed the death penalty in only three cases (category 1). Close review demonstrates that imposition of the death penalty for Harris is understandable and not an aberration when compared to the defendants in the category (5) group of cases because of the high level of victimization associated with the murder of Huggins, and because Harris did not present the same degree of mitigating evidence as that presented by the defendants in the cases in which the jury imposed a life sentence. The Harris jury could reasonably conclude that he was highly culpable and deserving of a death sentence.

In considering moral blameworthiness, the jury in Harris' case was limited to reviewing defendant's childhood up to thirteen years of age when deciding whether to impose the death penalty. The defense's experts concluded that as a child defendant suffered from a behavioral disorder. But the experts were limited to reviewing records only of Harris' childhood. Unlike many of the cases in category (5), no attempt was made to link defendant's childhood problems to his behavior on December 17, 1992. Additionally, defendant did not allege c(5)(a)(extreme mental or emotional distress) or c(5)(d)(diminished capacity) as mitigating factors, but instead relied on the c(5)(h)(catch-all) factor [4]. No

---

[4] *N.J.S.A.* 2C:11–3c(5)(a) reads in full that it is a mitigating factor if the jury finds:

> The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution.

*N.J.S.A.* 2C:11–3c(5)(d) states that it is a mitigating factor if the jury finds:

> The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect or intoxication, but not a degree sufficient to constitute a defense to prosecution.

Finally, *N.J.S.A.* 2C:11–3c(5)(h) states that it is a mitigating factor where the jury or the court finds:

> Any other factor which is relevant to the defendant's character or record or to the circumstances of the offense.
> [*Ibid.*]

evidence was offered to show that any psychological problems Harris endured as a child affected him as an adult at the time of his crime. For that reason, Harris' case is easily distinguishable from those defendants in the D category that received a jury-imposed life sentence. We examine each for purposes of contrast.

Defendant Bruce Cunningham suffered an abusive childhood that may be said to be similar in nature to the abuse suffered by Harris. However, an expert testified during Cunningham's penalty phase that the defendant suffered from a mental disease or defect as a result of a paranoid personality disorder. The jury agreed, finding that c(5)(a) and c(5)(d) applied as mitigating factors in Cunningham's case. No similar finding was made in Harris' case.

The jury in defendant Keith Dickerson's case found that c(5)(a) and c(5)(d) applied as mitigating factors. Evidence was admitted that Dickerson suffered from a long history of drug abuse and, as a result, he experienced bouts of paranoia and hallucinations.

Defendant Jerry Spraggins presented mental condition mitigating evidence that may have contributed to the jury's decision to sentence Spraggins to life rather than death. A psychiatrist testified that Spraggins suffered from voyeurism, an uncontrollable need to view woman. The jury found that c(5)(d) (diminished capacity) and c(5)(f) (no prior criminal history) applied in Spraggins' case. Unlike Harris, the defense in Spraggins' case managed to link his mental disease or defect to the crime committed and Spraggins had no criminal record, unlike Harris.

The mitigating evidence presented in the case against Christopher Thomas(2) was also more compelling than the evidence presented in Harris' case. A psychiatrist testified during the penalty phase that Thomas suffered from paranoid schizophrenia and an anti-social personality, which manifests itself in fits of violence and causes auditory and visual hallucinations. A second

defense witness corroborated that diagnosis. Thomas was admitted to a psychiatric hospital as a result of a suicide attempt a year before murdering his victim. He also suffered from a history of drug and alcohol abuse. The jury in Thomas' case, by finding that mitigating factor c(5)(a) applied, reasonably may have concluded that Thomas' mental disease or defect contributed to Thomas' criminal behavior and for that reason determined to impose a life sentence.

Defendant relies on the case of defendant Richard Chippero for purposes of proportionality review. Harris and Chippero both were abused during their childhood. However, the abuse endured by Chippero seems to have been more severe. Two of Chippero's step-parents were imprisoned for abusing him. Unlike Harris, Chippero was diagnosed with a specific mental disease. At age seven, he was diagnosed as hyperkinetic, emotionally disturbed and mentally retarded. Later he was determined to suffer from bipolar disorder. A year after he graduated from a school for mentally disturbed students, Chippero was admitted to a psychiatric hospital. He was institutionalized on four separate occasions. The jury in Chippero found that Chippero's mental state mitigated his culpability in committing the crime. They concluded that both c(5)(a) and c(5)(d) applied as mitigating factors. In contrast, in Harris' case the jury found that his aggravating factors outweighed his mitigating evidence. We note that on appeal Chippero's conviction has been set aside and a new trial ordered because of his illegal arrest and interrogation. *State v. Chippero,* 164 *N.J.* 342, 753 *A.*2d 701 (2000). On retrial, his confession must be suppressed due to the "unbroken causal connection between his arrest and confession." *Id.* at 362, 753 *A.*2d 701.

Defendant Gerald Williams also suffered from a history of depression that resulted in the jury finding mitigating factor c(5)(d) applied. In addition, Williams also indicated that he had abused cocaine and alcohol daily for fifteen years. In combination,

it is readily inferable that those factors influenced the jury's determination to forego a capital sentence.

Several of the defendants in category (5) presented evidence of severe intoxication in support of a finding of diminished capacity at the time of the crime, which may have deterred the juries in those matters from imposing a death sentence. One example is Cunningham. The jury found that mitigating factor c(5)(d) applied because Cunningham was extremely intoxicated when he killed his victim and he had a history of excessive drinking and drug abuse. He started drinking in the early morning hours, went to his ex-wife's home and tried to sexually assault her. She managed to retreat to safety. Then, Cunningham picked up more alcohol, got on a bus and drank the additional alcohol. His victim talked to him on the bus, disembarked with him, and may have agreed to have sexual relations.

The jury found only one aggravating factor, c(4)(g) (contemporaneous felony), but found four mitigating factors: c(5)(a) (extreme mental or emotional disturbance), c(5)(c) (age of defendant), c(5)(d) (diminished capacity) and c(5)(h) (any other factor relevant to the case). Those mitigating factors were found to outweigh the one aggravating factor. Cunningham was sentenced to eighty years, with a thirty-year period of parole ineligibility.

Dickerson also was intoxicated when he decided to kill his victim. Immediately before committing the crime Dickerson was freebasing cocaine. Expert testimony presented to the jury indicated that defendant experienced bouts of paranoia and hallucinations when abusing cocaine and that he had a cocaine delusional disorder. The jury in Dickerson's case found mitigating factor c(5)(d) applied, as well as c(5)(a) (emotional disturbance), c(5)(c)(age) and the catch-all factor, c(5)(h), and that those mitigating factors outweighed the one aggravating factor found, c(4)(g) (contemporaneous felony).

Evidence of intoxication presented in the case against defendant Scott Johnson contributed to the jury finding that mitigating factor c(5)(d) applied. One of the many experts that testified to

support defendant's presentation of mitigating factors indicated that Johnson's behavior on the night of the murder was consistent with the actions of a person high on crack, showing specific signs of intoxication as well as signs of early cocaine withdrawal.

Johnson made an extensive presentation on mitigating factors. Several of the factors under the omnibus catch-all mitigating factor of c(5)(h) were found. Johnson presented evidence of horrible abuse he endured while a child. Testimony was put forward that although chronologically twenty-three years of age, his mental age was much less and he had a borderline IQ. Johnson, it will be recalled, released the victim's three-year-old daughter unharmed on the premises of a day care center. The jury also viewed a letter wherein Johnson offered to plead guilty and to take responsibility for the crime, and he testified to his remorse for the offense.

On their review of Johnson's horrific crime balanced against his carefully and thoroughly marshaled presentation of mitigating evidence, the jury could not agree on imposition of the death penalty. In so many respects Johnson's case is very similar to that of Harris. But the fact that the jury could not agree in Johnson, yet could agree in Harris, to impose a death sentence, does not render Harris' sentence disproportionate. We note specifically the contemporaneous diminished capacity of Johnson at the time of his offense—a fact notably missing for Harris. In view of the three other cases in which a death sentence was imposed (Bey, J. Williams and Zola), the jury's judgment of Harris' culpability and its imposition of the death penalty for him is not rendered disproportionate by Johnson's life sentence.

John Seymour Reese beat his victim while drunk. Evidence presented at Reese's trial indicated that he was known to be an alcoholic who tended to be abusive towards women. His conduct on the night of the murder was consistent with this assessment, and therefore most likely contributed to the jury's finding that mitigating factor c(5)(d) applied, and to its inability to decide on a

capital penalty. The court sentenced him to life with a thirty-year parole disqualifier.

Defendant Mark Luciana presented evidence that he was severely intoxicated at the time of his crime. The jury found that c(5)(d) applied as a mitigating factor. The jury also found three other mitigating factors—his age, lack of a prior criminal record and the catch-all factor. Again, the jury was unable to reach a decision on the death penalty, so a life sentence was imposed.

Finally, defendant Gerald Williams presented evidence that he had been using cocaine and alcohol daily for fifteen years. He also had a history of depression. That evidence of diminished capacity and mental disorder apparently influenced his jury to sentence noncapitally.

Our review of the cases in category (5) illustrates recurring themes. Evidence was presented in those cases that indicated the defendants either were severely intoxicated or had diminished capacity due to drug abuse, or were suffering from a mental disease or defect when murdering their victims. In some, evidence was presented on both points. Evidence of a similar nature was not presented in Harris' case. The jury in Harris' case did not find that c(5)(a) or c(5)(d) applied as a mitigating factor. The jury's finding of those mitigating factors in the category (5) cases, when compared to Harris' coldly sober and deliberate abduction, rape and eventual killing of Huggins, differentiates Harris' case and makes his death sentence non-aberrational when compared to the above-mentioned cases in category (5). Harris is simply more deathworthy than those defendants.

Finally, we conclude our discussion of the category (5) cases by focusing on three cases that the parties agreed to use during proportionality review. Those three cases, Marrero, Prater and Rivera, do not fit as neatly into the previous discussion. However, when comparing Harris to those cases, Harris's sentence is still not demonstrably aberrational.

The jury imposed a life sentence for defendant Adam Marrero. Unlike Harris, Marrero was relatively young when he committed murder, twenty-three years old. Marrero and his victim agreed to have sex. A struggle ensued at some point and Marrero, possibly accidentally, strangled his victim in the midst of this violent sexual episode. The cold and deliberate actions of Harris stand in marked contrast to Marrero's crime, leading us to conclude that Marrero's life sentence does not render Harris' death penalty disproportionate. We also note that Marrero displayed more redeeming characteristics than Harris. Among other things, he had been employed on a more consistent basis.

The prostitute victim in defendant Michael Anthony Prater's case, as noted before, initially agreed to have sexual relations with Prater and his co-conspirator, so a kidnapping or other form of forced abduction did not initiate the defendant's contact with his victim. In stark contrast, Huggins was not a willing participant at any stage of the crime. In Prater's case, the jury rejected two of the three aggravating factors offered, while finding mitigating factor c(5)(h). Thus the jury had to weigh one aggravating factor against one mitigating factor. The jury apparently was reluctant to impose the death penalty where there is need to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. In contrast, in the penalty phase of Harris' trial, the jury found that the State's two aggravating factors applied and outweighed defendant's single mitigating factor.

Finally, we note that evidence of intoxication was presented in the case brought against defendant Rafael Rivera. Shortly before robbing an elderly neighbor, Rivera had been seen visibly intoxicated. It was revealed during the penalty phase of his trial that he had a history of abusing cocaine, marijuana and alcohol. The jury apparently believed that evidence of diminished capacity because mitigating factor c(5)(d) was found as was factor c(5)(h). As with several of the other cases within this category, the jury was unable to agree on the death penalty; hence a life sentence was the penalty imposed by the court.

### 3. *Precedent–Seeking Review Conclusion*

Our precedent-seeking review does not show that Harris' sentence is disproportionate. As our frequency analysis review demonstrated, sexual assault murders are treated as more death-worthy than most of the other death-eligible categories. They proceed to the penalty phase at a higher rate than the overall average for death-eligible cases and the death penalty is imposed at a higher rate than the full universe of death-eligible cases.

It was not statistically aberrational for Harris' case to be prosecuted capitally or for the death sentence to be imposed. And, when factually examined in precedent-seeking review, both decisions clearly are justifiable. Unlike cases in his universe where the prosecutor determined to forego a capital prosecution, Harris' case posed no impediments to such a prosecution. For similar reasons, Harris' case is more comparable to those three cases in which the death penalty was imposed than to those cases in which a life sentence was imposed.

Harris failed to prove any diminished capacity or extreme mental condition affecting him at the time of his crime. He was thoughtful, deliberate and unhurried in all aspects of his carjacking, terrorization, rape and shooting of Huggins during the two hours of her ordeal with him. That was substantially dissimilar from the many cases in the D (sexual assault) category where the homicide was committed in the course of a violent sexual encounter between the defendant and victim. This was a premeditated homicide, carefully executed. Defendant offered no remorse, never taking responsibility for his offense. Because Harris' case is more comparable to the three cases in his universe in which the death penalty was imposed, and may be distinguished from the others we have examined, Harris' death sentence cannot be viewed as aberrational. He was not singled out unjustly for capital punishment. Harris has not demonstrated that his sentence is disproportionate.

## III. *OTHER ARGUMENTS*

### A. *Alleged Impermissible Influence of Pretrial Publicity*

Defendant claims that trial publicity associated with his prosecution and penalty phase trial caused an impermissible influence on the jury and resulted in a violation of his right to a fair trial. Those arguments were addressed comprehensively and rejected in the appeal of his conviction. *Harris, supra,* 156 *N.J.* at 133, 141–57, 716 *A.*2d 458. We see no basis to revisit those issues because they have been disposed of fully and fairly. Moreover, our frequency analysis and precedent-seeking review have reinforced that conclusion by demonstrating the nonaberrational nature of the prosecutor's decision to proceed to the penalty phase of this capital case and the jury's decision to impose the death sentence.

### B. *Alleged Systemic Disproportionality*

Defendant makes an independent argument that race plays a significant role in the capital sentencing system generally, and affected his sentence in particular. Consequently, he contends that his death sentence violates his right to equal protection of the laws and has subjected him to cruel and unusual punishment under the state and federal constitutions. Specifically, defendant asserts that prosecutors are more likely to seek the death penalty and juries are more likely to return a death verdict if the victim is white. He contends that that risk was exacerbated in this case due to the combination of the alleged inadequacy of the trial court's *voir dire* during jury selection, and the testimony of co-defendant Gloria Dunn, who, for the first time at trial, testified that Harris killed Huggins because she was white.

As to the latter two assertions regarding the *voir dire* and the Dunn testimony, we note again that this Court already has reviewed and disposed of defendant's contentions regarding those issues in the appeal of Harris' conviction. *Harris, supra,* 156 *N.J.* at 161–68, 182–83, 716 *A.*2d 458. Again, we see no basis to revisit those issues because the Court's previous rulings fully and fairly disposed of them. In view of those previous rulings, defendant's

revived arguments do not demonstrate that racial discrimination contaminated his case. Accordingly, we turn to defendant's alleged systemic disproportionality in the application of the death penalty.

The Court's sentiment concerning allegations of a systemic racial effect on the administration of the Death Penalty Act was expressed in *Marshall II:*

> A death-penalty statute that systemically discriminates on the basis of race of the victim or race of the defendant menaces the institutions and foundation of a free democratic State.
>
> [130 *N.J.* at 209, 613 *A.*2d 1059 (quotations omitted).]

Thus, the Court has examined claims of racial disproportionality for proof of discrimination that would require the overturning of a death sentence. *Id.* at 213, 613 *A.*2d 1059.

Our most recent comprehensive analysis is revealed in the Court's decision in *In re Proportionality Review Project (II),* 165 *N.J.* 206, 757 *A.*2d 168 (2000) (*Proportionality Review (II)* ), also decided today. In that decision we reviewed Judge Baime's report that concluded that no reliable statistical evidence of race effect in the application of the death penalty has been produced.

> We find no reliable statistical evidence that the race of the defendant influences death sentencing either at the penalty trial stage or in the larger death-eligible sample of cases. Nor does the statistical evidence support the thesis that the race of the defendant affects which cases progress to penalty trial. Further, the statistical evidence suggests that the race of the victim does not affect death sentencing rates—killers of white victims are no more likely to receive the death penalty than killers of non-white victims. Finally application of our monitoring system discloses no consistent statistical evidence indicating that the race of the victim affects which cases progress to a penalty trial. However, some of the evidence in that respect is conflicting, and the issue should be revisited when the database increases.
>
> [*Baime Report II, supra,* at 66.]

We concurred with Judge Baime's conclusion. *Proportionality Review (II), supra,* 165 *N.J.* at 215, 757 *A.*2d 168. No statistical methodology currently in use demonstrates any risk of racial discrimination in the application of the death penalty. *Ibid.* That determination is controlling here. Thus, we reject defen-

dant's argument that racial bias or discrimination impermissibly affects New Jersey's death sentencing system.

## IV

Based on our determination that defendant Harris' death sentence is not disproportionate, we affirm the sentence of death.

## Appendix A [1]

I. *Agreed Upon Cases*

A. *State v. Marko Bey*

On April 26, 1983, Carol Peniston left Neptune High School around 9:20 p.m. after attending a computer course at the school. She did not return home nor report to work the next day because Marko Bey accosted her in front of her apartment building.[2] He demanded that she give him money, but once he heard someone coming, he led her into a nearby shed and killed her.

Bey admitted to killing Ms. Peniston, but did not know why he did it and acknowledged that it should not have happened. He stated that four-and-one-half hours before the murder, he had consumed 120 ounces of malt liquor, some straight rum and smoked a considerable amount of marijuana. Bey informed police that he became scared when he noticed that the victim looked at him while he rifled through her pocketbook. He stated that once Ms. Peniston saw his face, "that's when I started hitting her, it just went too far, something that shouldn't have went on."

Bey repeatedly struck Ms. Peniston, sexually assaulted her, took eight dollars and her car keys from her pocketbook, and left

---

[1] An asterisk (*) after the name of the case indicates that the defendant was assigned to the D-2 group of cases. Otherwise, the cases discussed in this appendix were assigned to the D-1 group of cases.

[2] Defendant waived his Miranda rights and provided a statement to the police regarding the robbery, sexual assault and murder of Ms. Peniston.

her to die. While on his way to Newark in her car, he collided with an iron fence. Defendant's fingerprints were found on the rear-view mirror of the abandoned car.

Ms. Peniston's body was not found until May 3, 1983. Her pocketbook was found by someone near an old industrial building in Asbury Park. Shortly thereafter, the police discovered her body in a shed located near the building. An autopsy disclosed that she had been dead for several days before her body was found. The autopsy further disclosed that she had been beaten, sexually assaulted, and strangled. The medical examiner concluded that Ms. Peniston's assailant had stomped on her chest because the assailant left an imprint of his sneaker on her chest. Her ribs were fractured and there was evidence of hemorrhaging of her right lung, vertebral column, and right atrium of the heart. It was determined that the ultimate cause of death, however, was ligature strangulation. Subsequent police investigation revealed that characteristics of spermatozoa found on the victim's coat were consistent with those of defendant's saliva, and that the imprint of defendant's sneakers was similar to the impression left on the victim's chest.

Bey was charged with murder, felony murder, kidnaping, aggravated assault, aggravated sexual assault, robbery, and theft. The State alleged two aggravating factors: extreme suffering, and murder during the course of a felony. While awaiting trial for Ms. Peniston's murder, Bey was found guilty of murder and sexual assault in an unrelated criminal proceeding. That murder had been committed before the murder of Ms. Peniston. He was sentenced to death for the unrelated murder.

A jury convicted defendant Bey for knowingly or purposely murdering Carol Peniston. The jury also convicted defendant of felony murder, first-degree kidnaping, second-degree aggravated assault, first-degree aggravated sexual assault, first-degree robbery, and third-degree theft.

The State filed notice of two aggravating factors: c(4)(c) (extreme suffering) and c (4)(g) (during the course of a felony), and relied on the evidence adduced at the guilt phase, in addition to several photographs.

The defendant presented testimony by his aunt and mother and an expert from the Center of Applied Social Research at Northeastern University. His mother and aunt's testimony was summarized by the Court as follows:

> Defendant's aunt testified about defendant's parents and childhood, stating that defendant was an illegitimate child whose father rejected him and whose mother, the sister of the witness, became an alcoholic and abused defendant. According to his aunt, when defendant was fourteen years old, he began to drink alcoholic beverages and use drugs. He overdosed on alcohol and marijuana, and was hospitalized twice. Defendant's mother confirmed her sister's testimony and placed the blame for her son's conduct on herself. Defendant testified on his own behalf, apologized to Ms. Peniston's family, and stated that "maybe if I never would have taken drugs it would never have happened."

[112 *N.J.* at 147, 548 *A.*2d 887].

The jury found that the State proved aggravating factors and that the defendant failed to prove any of the mitigating factors asserted: c(5)(a) (extreme mental or emotional disturbance), c(5)(d) (impairment by intoxication), c(5)(c) (age) and c(5)(h) (catch-all).

The jury sentenced him to death. This Court upheld the convictions, but reversed the death sentence. *State v. Bey*, 112 *N.J.* 123, 548 *A.*2d 887 (1988). Although not in this category for comparison purposes, Bey's retrial of his penalty resulted in a jury verdict sentencing him to death a second time for the murder of Ms. Peniston and this Court affirmed that capital sentence. *State v. Bey*, 129 *N.J.* 557, 610 *A.*2d 814 (1992), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). Thereafter, Bey's death sentence was held not aberrational. *State v. Bey*, 137 *N.J.* 334, 645 *A.*2d 685 (1994), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995).

## B. *State v. Bruce Cunningham*

On February 3, 1983, thirty-four-year-old Bruce Cunningham began drinking heavily at 9:15 in the morning. At 1:00 that afternoon, Cunningham went to his ex-wife's house and found his ex-wife in her bedroom with another man. The man left and Cunningham tried to rape his ex-wife, but his son walked into the room causing Cunningham to stop. As his ex-wife and son left the house to go to the police, Cunningham followed, at one point mentioning that he had a knife in his knapsack.

Cunningham boarded a bus to return home, carrying a new supply of rum and beer. He met a woman on the bus and was later seen with that woman at his bus stop. According to Cunningham, they decided to find a secluded place to have sex, but an argument broke out while they were having sex. The State contended that during their walk, Cunningham kidnaped the woman, forced her to a deserted area, struck her in the head with a rock, stabbed her in the abdomen, and raped her. Afterward, Cunningham buried the woman's body and went to a nearby tavern. Someone at the tavern noticed that Cunningham's hands were covered in blood.

The next day, the victim's mother reported her missing. Police found the victim's body in an secluded area, covered with leaves. Defendant was identified as a suspect by a witness who saw Cunningham walking with the victim and from bite marks on the victim's breast that matched Cunningham's molar impressions. He was convicted of purposeful or knowing murder, felony murder, kidnaping, aggravated sexual assault and aggravated assault.

At the penalty phase, a psychiatrist testified that Cunningham was suffering from a mental disease or defect as a result of a paranoid personality disorder. Evidence was presented that Cunningham suffered from an abusive childhood. He dropped out of high school at age sixteen and had a history of excessive drinking and drug abuse. Although Cunningham entered the Navy and obtained a GED, for two years prior to the offense he had not

been employed. Cunningham's prior criminal record consisted of disorderly persons offenses, two burglaries, aggravated assault and battery. At the time of the offense, Cunningham was living with his wife and four children.

The State argued that the following aggravating factors applied: c(4)(c) (extreme suffering), c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony). The jury found only that the c(4)(g) applied. The jury found all mitigating factors presented by defendant applied: c(5)(a) (extreme mental or emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all). The jury found that the aggravating factors did not outweigh the mitigating factors. Cunningham was subsequently sentenced to an aggregate term of 130 years with a fifty-five-year parole disqualifier.

## C. *State v. Jerome Dennis* (2)

On or about January 12, 1992, a thirty-year-old woman was walking down a street when Jerome Dennis, a twenty-five-year-old male, followed her and forced her by knifepoint down a stairway. He made her undress, tied her up with shoe strings and had vaginal sex with her. He then stabbed her ten times in the neck and pushed her body down a hill, where her body was found approximately four months later. Her legs were tied together with a blue knotted material. Approximately a month prior to murdering this victim, Dennis raped and murdered a fourteen-year-old girl as described later in this Appendix A as *State v. Jerome Dennis* (1). He had only recently been paroled from Yardville and admitted into the Intensive Supervision Program.

Dennis had numerous prior convictions, including three adult convictions for sexual assault, two for criminal restraint and a prior robbery conviction. He did not attend school past the seventh grade and he denies any use of alcohol or drugs.

Dennis was charged with murder for this offense, but eventually pled guilty to felony murder and received a life sentence with a

thirty-year parole disqualifier term. He was also charged with an additional four homicides that he committed during a four-month period. All totalled, Dennis was charged with five counts of murder, three counts of felony murder, two counts of aggravated sexual assault, eight counts of unlawful possession of a weapon, eight counts of possession of a weapon, three counts of aggravated assault, one count of kidnaping, two counts attempted aggravated sexual assault, one count of burglary and one count of theft. Dennis pled guilty to the murder he committed as described in Dennis (1), three counts of felony murder (one of which is the murder described herein as Dennis (2)), one count of manslaughter and two counts of aggravated assault.

For the murder charge in Dennis (2), he received a life sentence with a parole ineligibility term of thirty-years. For the three counts of felony murder, he received a total of three life sentences that include thirty-year terms of parole ineligibility. For the manslaughter count, he received a ten-year sentence with a parole ineligibility term of five-years. For both aggravated assault charges, he was sentenced to two ten-year terms, with each carrying a five-year term of parole ineligibility. Each sentence runs concurrently. In sum, Dennis was sentenced to four life sentences, as well as to an additional thirty years for the remaining counts.

D. *State v. Keith Dickerson*

Twenty-year-old Keith Dickerson spent an evening free-basing cocaine. As he returned home, he walked to his neighbor's home and entered through an unlocked front door. He entered her bedroom as she was partially undressed, preparing for bed. She yelled and cursed at him. He punched her in the face and beat her unconscious, then he had vaginal intercourse with her. Afterward, he repeatedly stabbed her in the stomach, slit her throat, and strangled her with clothing. After he killed her, Dickerson stole thirty dollars from her wallet. He ultimately confessed.

Dickerson had prior convictions for aggravated assault and weapons possession, as well as a prior parole violation. He also had a long history of drug abuse and was often high on crack cocaine in the six months preceding the murder. Expert testimony verified that Dickerson had underlying violent impulses, and that his behavior changed markedly when he began abusing cocaine, including bouts of paranoia and hallucinations that exacerbated his underlying violent impulses.

A jury convicted him of capital murder, felony murder, aggravated sexual assault, robbery, and burglary. The jury found the c(4)(g) (contemporaneous felony) aggravating factor, but rejected the c(4)(f) (escape detection) factor. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors. The jury determined that the mitigating factors outweighed the aggravating factors. The court imposed a life sentence with a thirty-year parole disqualifier on the capital murder charge. Dickerson's aggregate sentence was life imprisonment plus forty-five years, and a term of fifty-two-and-one-half years of parole ineligibility.

E. *State v. Eugene Edwards*

On July 10, 1987, Eugene Edwards and Michael Prater raped, robbed, and killed a twenty-three-year-old prostitute. Earlier that evening, the two men succeeded in luring the victim into Edwards's house by promising a trade of drugs for sex. Once inside, Prater forced the woman to undress at knifepoint. Prater raped the woman while holding a knife to her head, then after urging Prater to hurry, Edwards took his turn raping her. Edwards left to clean up and while he was gone, Prater stabbed the woman. Because the woman did not die, Edwards strangled her with a belt and attempted to suffocate her, while Prater stabbed her three or four more times. The woman's pulse stopped, yet Prater hit her over the head with tin cutters to ensure she was dead. Afterward, the men went upstairs and fell asleep.

The next day, Edwards took the victim's purse and watch. He threw her purse off a bridge, and threw the knife onto a church roof next door. In the evening, Edwards put the victim's body along an outside wall of his home. The body was found in the morning and Edwards was arrested the following day. Edwards and Prater eventually confessed, each implicating the other in the crime.

Edwards was charged with murder, felony murder, robbery, aggravated sexual assault, and possession of a weapon for an unlawful purpose. He pled to purposeful or knowing murder, robbery and aggravated assault. Edwards received a life term with a thirty-year term of parole ineligibility for the murder count, a concurrent term of twenty-years for the robbery with a ten-year term of parole ineligibility, and a consecutive term of twenty years for the aggravated sexual assault with a parole ineligibility term of ten years. The felony murder charge and two remaining aggravated assault charges were dismissed.

Edwards had no prior record and no history of mental problems. The AOC coded the following factors as present: c(4)(g) (contemporaneous felony) aggravating factor, and c(5)(d) (mental disease or defect or intoxication), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) as mitigating factors.

## F. *State v. Scott Johnson*

On November 3, 1992, twenty-three-year-old Scott Johnson saw Gail Shollar in the parking lot of the Middlesex County Mall. Although the victim's three-year-old daughter was with her, Johnson approached the victim with a folding knife, grabbed her by the hair and forced her to drive around for two hours. Johnson then abandoned the daughter on the property of a day care center that had closed for the day and proceeded to rape and rob his adult victim. In order to prevent her from identifying him, he stabbed her over thirty times and dumped her body in a drainage ditch.

The daughter was discovered the next morning on the grounds of the day care center, cold, wet and in shock. She told police that a man with a knife grabbed her mother by the shirt and got into their van. She also said that her mother was crying and seemed scared. While the girl was being interviewed, police officers found the victim's van nearby. The keys were in the ignition, Mrs. Shollar's driver's license was on the floor, and there were bloodstains on the door and inside the van. The next morning, her body was found in the drainage ditch near Johnson's former girlfriend's house. She had been stabbed over forty times in her chest, forearm, neck and face. An autopsy revealed that she died from hemorrhagic shock and severe trauma to the vital organs from the stabbing. A vaginal smear revealed the presence of sperm.

Witnesses, with whom Johnson had discussed the offense, informed the police about Johnson and he was arrested. His palm prints matched those found on the victim's van. Johnson described the carjacking and murder in detail to the police but denied raping Mrs. Shollar. He said that the victim tried to get away, so he chased her. When he caught her, he repeatedly stabbed and killed her because she could identify him.

Police found the murder weapon where Johnson said it was located. Johnson said that on the day of the offense, he had smoked eighteen vials of cocaine, half of a bag of marijuana, snorted heroin, and drank six miniature bottles of liquor. His former girlfriend said that he had one beer and a hit of cocaine that night.

Johnson was charged with purposeful or knowing murder, four counts of felony murder, two counts of kidnaping, two counts of robbery, and one count each of burglary, aggravated sexual assault, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. A jury convicted Johnson of all charges, and the State sought the death penalty based on aggravating

factors c(4)(f) (escape detection) and c(4)(g) (concurrent felony). He had one previous conviction for robbery.

At the penalty phase, Johnson presented evidence about his troubled childhood, severe physical abuse by his father, hospitalization for pneumonia and seizures, behavioral problems associated with drug use, delusions, low intelligence, neurological problems, and diminished capacity during the offense. DYFS became involved with Johnson's family when he was five because of his mother's excessive use of corporal punishment and failure to send her children to school. Johnson was evaluated at age fifteen because of disruptive behavior and poor academic achievement. It was reported to DYFS that Johnson had been abused, burned with cigarettes, and hung by his neck with a rope. Further investigation determined that his IQ was in the borderline/educable range. He was diagnosed as having a conduct disorder and a development disorder, as well as having a socialized-aggressive personality.

A clinical psychologist testified that this abuse resulted in brain impairment, and that Johnson suffered from delusional disorder of the persecutory type, paranoid personality disorder with antisocial and passive/aggressive traits, and intermittent explosive disorder, which caused him to suddenly lose control or become aggressive, and then to blackout about what had occurred. The psychologist also testified that Johnson's history of substance abuse stretched back to age five and included alcohol, marijuana, crack, and heroin. He indicated that the description of Johnson on the night of the murder was consistent with a person high on crack, and that his behavior showed signs of intoxication and early cocaine withdrawal. Looking also at Johnson's intellectual inadequacy, neurological dysfunction, alcohol intoxication, residual cocaine intoxication and emotional disturbances, the psychologist testified that these factors severely impaired his cognitive judgment and behavior controls, possibly resulted in emotional disturbances and major depression, and "severely diminished" Johnson's ability to purposely or knowingly carry out the murder and sexual assault.

He also opined that Johnson's behavior was no longer voluntary after he released the daughter from the van.

A neuropsychology expert corroborated the diminished capacity theory by explaining how defendant's brain damage, intoxication, cocaine withdrawal and severe psychological stress prevented him from knowing what he was doing when he murdered Mrs. Shollar. The neuropsychologist also testified that Johnson suffered from dissociative disorder, organic personality disorder, and brain dysfunction.

A State expert testified in rebuttal that he found no evidence of organic brain syndrome or brain damage, and that based on the evidence, defendant acted knowingly and purposely throughout each step of the offense.

Also during the penalty phase, Johnson expressed his remorse for committing the crimes. His daughter testified about her love for her father.

The jury found all of the aggravating factors submitted by the State and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors submitted by Johnson. The jury rejected the c(5)(c)(age) mitigating factor. It was unable to agree on a capital sentence.

Accordingly, the court sentenced Johnson to life imprisonment with a thirty-year period of parole ineligibility for the murder. An aggregate sentence of life plus seventy years with sixty-five years of parole ineligibility was imposed.

## G. *State v. Adam Marrero* *

On August 26, 1998, twenty-three-year-old Adam Marrero accompanied his uncle to a friend's house where he met his victim, a thirty-four-year-old woman. Marrero left with his victim at around 11:30 p.m., and they were later seen at a local restaurant drinking and dancing. According to a bartender, the two left together at about 1:30 a.m.

The next day, the victim's sister reported her missing. Police interviewed Marrero, who said that he took. the victim directly home and went to the bar alone. After being confronted with inconsistencies in his story, defendant eventually admitted that he took the victim to the bar and did not get home until 7:00 a.m. The police noticed that Marrero's hands were bruised and his right hand had a small cut. They obtained a court order to hold him.

The victim's body was discovered on August 29th in a remote wooded area surrounding Central Park in Vineland. Her body was found nude, with her legs apart and her knees bent. Her arms were extended over her head, as if the body had been dragged. Her clothing was scattered around the area. Because her body was partially decomposed, she had to be positively identified through her dental records. It could not be determined whether she had been sexually assaulted, but seminal fluid found on her clothing matched Marrero, as well as thirty-six percent of the male population.

A jailhouse informant told police that Marrero had confessed to having drinks with the victim, having sex with her on the way home, and then grabbing her by the throat after she slapped him. According to Marrero, before he realized what he had done, the victim wasn't breathing.

Marrero was indicted for purposeful murder, felony murder, first-degree kidnaping, first-degree aggravated sexual assault, and second-degree sexual assault. He was later convicted on all counts except sexual assault.

Marrero grew up with an abusive alcoholic father and was beaten regularly. He never completed high school. At the time of the offense, he was not married but had fathered two children. Marrero claimed that prior to his arrest, he was drinking two to three eight-packs of beer a week, smoking marijuana once or twice a week, and using cocaine once a week. Marrero had worked as a carnival worker, diner employee, farm laborer, and security guard.

Marrero had been arrested three previous times for sexual assault and terroristic threats, a second sexual assault, and a third sexual assault and terroristic threats. At the time of the murder, he was on bail awaiting sentencing on those charges. The AOC coded the following factors as present: the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(h) (catch-all) mitigating factor.

For the purposeful murder and felony murder counts, Marrero was sentenced to two concurrent life terms, each having a thirty-year term of parole ineligibility. He also received a consecutive sentence of twenty years imprisonment for kidnaping and a concurrent sentence of twenty years for aggravated sexual assault. At sentencing, Marrero was first sentenced to a seven-year term of imprisonment for a sexual assault charge that he had pled guilty to earlier.

## H. *State v. Samuel Mincey*

On November 8, 1982, Samuel Mincey broke into the home of a seventy-three-year-old woman, beat her severely, raped and strangled her. He stole two oriental dolls and a television from his victim's home. In November 1988, police recovered one of the oriental dolls while investigating another burglary. An investigation implicated Mincey in the November 1982 murder.

Mincey was arrested six-and-one-half years after the murder and was charged with purposeful or knowing murder, felony murder, burglar, kidnaping, and robbery, but the non-murder counts were barred by the statute of limitations. A jury convicted Mincey of murder and felony murder. The State did not seek the death penalty, therefore Mincey was sentenced to life imprisonment with a thirty-year parole disqualifier. It has been suggested by the AOC that Mincey was not charged capitally because the prosecutor may have believed that the statute of limitations would have worked to bar a successful capital prosecution.

When arrested, Mincey was living with his wife and four children. He owned his own landscaping business. He admitted to

using marijuana and cocaine but denied any addiction. Before this offense, Mincey had been arrested on forty occasions and had sixteen prior convictions for offenses including assault, battery, burglary, escape, aggravated assault, receiving stolen property and auto theft.

The AOC coded as present the c(4)(c) (torture or depravity), c(4)(f) (escape detection), and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factors.

## I. *State v. Michael Anthony Prater*

The facts of Prater's offense were detailed in the case summary of Eugene Edwards discussed earlier in this Appendix A. We note that it was Prater who approached the crack-addicted prostitute to suggest the sex for drugs exchange. Also, it was Prater who was armed with a knife throughout the ordeal. When the parties entered Edwards' home, it was Prater who brandished his knife and forced the victim to remove her clothing.

Prater had a prior drug conviction and three disorderly persons convictions. He was raised in a violent home, where his father emotionally, physically, and sexually abused Prater's mother and attempted to rape Prater's sister. Prater had a borderline intelligence level, had a limited ability to use judgment, and acted impulsively. He had been diagnosed with attention deficit disorder. He began abusing alcohol when he was eleven-years-old and started using drugs five years later.

A jury convicted Prater of capital murder, felony murder (two counts), aggravated sexual assault (three counts), theft, and a weapons offense. The jury found the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(h) (catch-all) mitigating factor. The jury rejected the c(4)(c) (torture or depravity) and c(4)(f) (escape detection) aggravating factors. The jury could not determine whether the aggravating factors outweighed the mitigating factors so the court sentenced Prater to life imprisonment with a thirty-year parole disqualifier on the murder count. Pra-

ter's aggregate sentence was life plus twenty years, with a forty-year term of parole ineligibility.

### J. *State v. John Seymour Reese*

On August 8, 1987, Reese came home to his apartment building after an evening of drinking. At some time that night, Reese noticed his neighbor's apartment door ajar. He went into the apartment and found his forty-two-year-old neighbor asleep in her bed, so he tied her hands behind her back and placed a shirt over her head. He raped her and afterward hit her over the head seventeen times with a claw hammer. Reese then returned to his apartment, cleaned up, and went to sleep. The next day, he threw the hammer away at a nearby farm.

The victim died from her injuries. Hair, fingerprint, and DNA evidence connected Reese to the scene of the crime. Reese initially denied any involvement in the murder. Subsequently, Reese confessed, claiming that the victim was the aggressor.

A jury convicted Reese of purposeful or knowing murder, felony murder, aggravated assault (two counts), kidnaping, criminal restraint, aggravated sexual assault (two counts), burglary, hindering apprehension, and a weapons charge. A jury found him guilty on all charges.

At the penalty phase, Reese's parents testified that he took care of his brothers and was a role model for them. Reese also presented evidence that he worked on the inmate liaison committee and had been attending Alcoholics Anonymous while in prison. A deputy warden of his correction facility testified that Reese was a model inmate. Reese had no prior convictions, but he had been arrested in 1979 for assaulting a female co-worker at her home while drinking. At the time of his arrest, Reese was a full-time employee at a local farm where he had worked for five years.

Reese was an alcoholic who became abusive toward women when he was intoxicated, and he emphasized the role of alcohol in this offense. Some of Reese's ex-girlfriends testified that he had

often wanted to tie them up during intercourse and he abused them sexually on several occasions when he was drunk.

The jury found the following aggravating factors applied: c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony). The jury rejected the c(4)(f) (escape detection) as an aggravating factor. The jury also found the following mitigating factors applied: c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

Reese was sentenced to life imprisonment with a thirty-year parole disqualifier because the jury could not reach a conclusion as to the death sentence. For the aggravated sexual assault charge, he received a consecutive twenty-year sentence with a ten-year parole ineligibility term. For the remaining counts, he received concurrent sentences. Among the concurrent sentences was a twenty-five-year sentence for kidnaping, which was merged with the criminal restraint charges. Thus, Reese's aggregate sentence was life plus twenty years, with a parole ineligibility term of forty years.

K. *State v. Rafael Rivera*

On July 16, 1983, Rafael Rivera murdered seventy-eight-year-old Elizabeth Cornwall in her Newark apartment. Rivera lived next door to Cornwall and had a close relationship with her. Cornwall often babysat for Rivera's children. They referred to Cornwall as their "grandmother."

In the early evening hours of July 16th, Rivera went into Cornwall's apartment and looked for money while Cornwall was visiting Rivera's girlfriend. Cornwall, while walking with the assistance of her cane, entered her apartment while Rivera was still there. A struggle ensued, and Rivera struck Cornwall many times in the face, forearms, ribs, and back. He tore her vagina with either his hand or her cane. Ultimately, he killed her by suffocating her with a pillow.

Witnesses heard suspicious noises coming from Cornwall's apartment on July 16th. Specifically, the witnesses heard a bed squeaking and a man's voice coming from the area of the victim's bedroom.

An autopsy revealed that Cornwall's face, neck, forearms, and mid-back were covered with bruises, probably caused by slapping, punching, or a series of blows. There were pressure marks on the left side of her jaw, and marks on the right side of her face indicated linear abrasions surrounded by bruising. Hemorrhaging was found under her tongue, behind her eye, and underneath her cheek. She had two fractured ribs. The autopsy also showed that Cornwall had been sexually assaulted. Her vagina was torn in the back and bleeding, and there was bruising of the mucous membrane and the area near the urethra.

Rivera eventually confessed to killing her. Police arrested him and charged him with knowing or purposeful murder, felony murder, robbery, aggravated sexual assault and burglary. A jury convicted him of all counts, except for the felony murder charge.

It was revealed at the penalty phase that Rivera had a history of abusing cocaine, marijuana and alcohol. He was seen drunk shortly before the murder. At the time of the murder, Rivera was living with his girlfriend and their three children, and was working as a truck loader. He had prior convictions for possessing a stolen car, entry with intent to steal, receiving stolen property, weapons possession and eleven disorderly persons offenses.

The jury found the following aggravating factors applied: c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony). The jury found the following mitigating factors applied: c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. It rejected the c(4)(f) (escape detection) aggravating factor and the c(5)(c)(age) mitigating factor.

The jury was unable to reach an unanimous verdict, thereby precluding the death penalty. The court sentenced Rivera to life imprisonment with a thirty-year parole disqualifier for the mur-

der. He was also sentenced to a consecutive extended term of life imprisonment with a twenty-five-year period of parole ineligibility on the aggravated sexual assault count. Rivera was sentenced to concurrent custodial terms of twenty years for the robbery offense and ten years for the burglary offense.

### L. State v. Jerry Spraggins *

On September 2, 1983, Jerry Spraggins saw a sixty-eight-year-old woman through her apartment window. He broke in through the window, and before she could scream he put a pillow over her face. He sexually assaulted her, took her pocketbook and a gold chain. An autopsy later showed that she had been smothered and strangled to death. Police arrested Spraggins in April 1985. He told the authorities about the sexual assault, but said that he did not know she died. Eventually, Spraggins was linked to the murders of two other women in the victim's apartment building.

With regard to the September 2nd offense, Spraggins was charged with murder, felony murder, burglary, aggravated sexual assault and theft. The State served notice of aggravating factors c(4)(c) (extreme suffering), c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony). A jury convicted Spraggins of burglary, aggravated sexual assault, purposeful or knowing murder and felony murder.

During the penalty phase, Spraggins's mother testified about his good behavior as a child. A psychiatrist testified that Spraggins suffered from voyeurism (an uncontrollable need to view women), and that the voyeuristic thoughts would diminish with age. There was evidence that defendant did not seek professional help for his voyeurism for fear of embarrassment, but had had some mental health counseling in the past.

Spraggins is a high school graduate and has a son. He was 28 and lived with his parents at the time of the offense. His prior record consists of convictions for invasion of privacy, larceny, criminal trespass, criminal sexual contact and indecent exposure.

The jury found the following aggravating factors: c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony). The jury found mitigating factors c(5)(d) (mental disease or defect or intoxication) and c(5)(f) (no significant criminal history), and rejected factors c(5)(c)(age) and c(5)(h) (catch-all). For the murder charge, Spraggins was sentenced to a life term with a thirty-year term of parole ineligibility. The felony murder charges were merged with the murder charges. Spraggins also received a consecutive twenty-year sentence with a ten-year parole ineligibility term, for the aggravated sexual assault conviction. Finally, for the burglary charge, Spraggins was sentenced to a concurrent ten-year term.

## M. *State v. Christopher Thomas* (2)

Seven days after his release from prison, thirty-one-year-old Christopher Thomas entered a tailor shop and attacked the owner, a fifty-six-year-old woman. He fractured her skull with a heavy thirteen-inch steel wrench and she died from the head injuries. Thomas took items from the victim's pocketbook and stole rings from her fingers. He also attempted to sexually assault her.

The State charged Thomas with purposeful or knowing murder, felony murder (two counts), robbery (two counts), attempted sexual assault, and weapons offenses. Thomas waived his right to. a jury trial. The court convicted him of all charges.

At the penalty phase, a psychiatrist testified that Thomas suffers from paranoid schizophrenia, has an anti-social personality, is subject to fits of violence and has auditory and visual hallucinations. A second defense expert corroborated the diagnosis. A year before this murder, Thomas was admitted to Trenton Psychiatric Hospital after an attempted suicide. Thomas never knew his father, and Thomas' mother was an alcoholic. As a child, Thomas was mentally abused. He had a long history of drug and alcohol abuse, for which he received treatment two years before the murder.

Thomas had prior convictions for robbery, aggravated assault, larceny (four convictions), shoplifting (two convictions), and tampering with an automobile. Over a year before this crime, he had murdered an elderly woman. He had been unemployed for seven years prior to the offense.

The trial judge found the c(4)(g) (contemporaneous felony) aggravating factor applied. The jury found the following mitigating factors applied as well: c(5)(a) (extreme emotional disturbance), c(5)(d) (diminished capacity) and c(5)(h) (catchall). Thomas was sentenced to life imprisonment for the murder, with a thirty-year parole disqualifier term. The court also sentenced Thomas to a consecutive twenty-year term with a ten-year minimum for the robbery. In addition, Thomas was sentenced to a consecutive ten-year term with a five-year minimum for the attempted sexual assault. The remaining counts were merged for sentencing, thus, his aggregate sentence was life plus thirty years with a forty-five-year parole bar.

### N. *State v. James Williams*

Twenty-three-year-old Beverly Mitchell worked part-time as a receptionist at a Trenton nursing home in addition to her full-time position as a teacher at Trenton High School. She reported to work at the nursing home at approximately 4:00 p.m. on December 30, 1982, and was later seen at her typewriter later at 6:05 p.m. A nurse noticed her missing at 6:45 p.m. and walked into an office that adjoined the reception area. As she turned on the light, she noticed Ms. Mitchell's body lying on the floor. She was dead.

The nurse described the scene as gruesome. The victim's body was lying face down and naked. Her clothes were strewn about the room. There was blood all over the room. Under the body, an undergarment, some pieces of jewelry and a steak knife were found covered in blood.

The autopsy determined that she had been stabbed thirty-six times, including twenty-one wounds in her back. There were bruises, contusions and abrasions in numerous areas of her body, and her throat was slashed. The medical examiner concluded that it was the wounds to the victim's back that probably were fatal.

James Williams' brother, Floyd Williams, had accompanied the defendant to the nursing home the evening of December 30, 1982.[3] Two days after the murder, Floyd informed the police what had happened. Floyd testified that the two brothers drank beer at James Williams' apartment prior to the killing. Williams spoke and acted aggressively at one point during their drinking binge. He specifically spoke of going to make money that night and possibly "beat up some white boys." He then placed a knife in his belt. Floyd did not believe he was serious, but accompanied Williams to the nursing home.

When the two entered the nursing home, the victim was sitting at the receptionist desk. Williams told her that he wanted to see a Mr. Hoffman. She indicated that Mr. Hoffman was located on the second floor. Floyd then walked to the elevator, but Williams instead approached the receptionist and pushed her into a "back room." Floyd followed them. Williams closed the door, shut the lights and ordered the victim to take off her clothes. She first complied, but then stopped. Williams became angry and began hitting her.

Williams, a 6'6" male, forced the victim, who stood at 5'2", to the floor, while Floyd stood by and watched Williams rape the victim. She screamed, so Williams placed his hands over her mouth and started to cut her with the knife he had brought with him. The victim managed to stand up, but Williams stabbed her in the back. As she fell to the floor, defendant got down on one knee and

---

[3] The brothers met only a few months prior to the killing because they were both raised in foster homes. Floyd was either seventeen or eighteen at the time of the killing; his brother James was twenty-one.

"started stabbing her in the back." Williams attempted to give the knife to Floyd to stab her, but Floyd refused. On the way out, Williams took her pocketbook.

Williams was charged with knowing and purposeful murder, felony murder, robbery while armed, sexual assault while armed, and burglary while armed. The jury convicted Williams on all counts.

The State relied on the following aggravating factors: c(4)(c)(intent to cause suffering) and c(4)(a) (committing a murder during a robbery, aggravated sexual assault, or burglary). The State also presented photographs of the victim's body and testimony from the medical examiner that demonstrated that the victim remained conscious after the frontal wounds were inflicted and she had lived several minutes after sustaining the fatal back wounds.

The defense presented the following mitigating factors: c(5)(h)(extreme mental or emotional disturbance), c(5)(d)(mental disease or defect or intoxication), c(5)(c)(age) and c(5)(h) (catch-all). The jury found the catch-all factor applied as a mitigating factor, but that it was outweighed by the aggravating factors. Williams was sentenced to death. The three felony murder counts merged with the murder charge and he was sentenced to a twenty-year term for the robbery with a ten-year minimum. For the aggravated sexual assault count, Williams received twenty years with a ten-year minimum. He received a ten-year term with a five-year minimum for the burglary.

On appeal, Williams' sentence and conviction were overturned because this Court found that the *voir dire* questioning of the prospective jurors was inadequate, combined with the decision not to dismiss a prospective juror for cause, required a reversal and a remand of the matter. *State v. Williams,* 113 *N.J.* 393, 550 *A.*2d 1172 (1988). Williams pled guilty to felony murder instead of being subjected to a new trial. He was sentenced to life imprisonment.

## O. *State v. James Zola*

On the morning of January 17, 1983, a neighbor was worried because she feared that there was something wrong with a nearby tenant. She noticed that approximately a week's worth of newspapers had piled up outside the door of seventy-five-year-old Barbara Berrisford. The apartment complex's superintendent entered the apartment and found Mrs. Berrisford spread-eagled on her bed, clothed only in a girdle and wrapped in a sheet. The victim was tied to the corners of her bed by leather thongs. Her throat, left temple and nose were wounded, and her throat and neck also were bruised.

It was later determined that sixty-percent of the victim's body was missing skin due to scalding. No sign of trauma to the victim's sexual organs was detected. No evidence of semen was found in her body. She died from asphyxiation by manual strangulation. The State sought to prove sexual penetration of the victim by emphasizing all the circumstantial evidence: her unclothed body was discovered bound and spread-eagled; the defendant's underwear was found under her pillow and the apparent presence of saliva in her genital cavity. The estimated date of death was January 13th. The victim's purse was missing and never recovered.

An investigation led authorities to James Zola, a former maintenance man at the apartment complex. Mrs. Berrisford had complained to Zola's supervisor about his work. He was eventually fired from that position.

Defendant did not testify at trial. Instead, a psychiatrist and a psychologist introduced defendant's account of the killing. He claimed to be under the influence of alcohol and drugs and was imagining that he was being chased by police and police dogs. He took refuge in the basement of the victim's apartment complex, and later broke into Mrs. Berrisford's while she was not home. When Mrs. Berrisford arrived home, Zola grabbed her and asked

her where the police were. He tied her up and hit her head to prevent her from signaling the police.

Zola then thought he inflicted a fatal wound. To attempt to revive her, he tried to give her food and drink. He then took her clothes off and put her in the bathtub. He left scalding water running for a period of time and left to check on the door. When he returned, he was panicked by her condition and placed her on the bed to cover her up. He then went home to go to sleep.

Zola was charged with knowing and purposeful murder, burglary, aggravated sexual assault, kidnaping and robbery. Evidence was presented during trial that indicated Zola came from a broken home and a troubled past. Zola was found guilty on all charges.

At the penalty phase, the State relied on the following aggravating factors: c(4)(g) (contemporaneous felony) and c(4)(c)(torture or depravity). Both aggravating factors were found to apply. The jury also found two mitigating factors applied: c(5)(a)(extreme emotional disturbance) and c(5)(h)(catch-all). The jury concluded that they did not outweigh the aggravating factors. Zola was sentenced to death.

This Court reversed the death sentence because the trial court failed to instruct the jury that the aggravating factors must outweigh the mitigating factors beyond a reasonable doubt. *State v. Zola*, 112 *N.J.* 384, 390–91, 548 *A.*2d 1022 (1988). On remand, Zola pled guilty to murder and received a life sentence.

## II. *Additional Cases Offered by Defendant*

### A. *State v. Robert Bolinger* *

For approximately three days prior to murdering his twenty-three-year-old victim, Bolinger watched and followed her. On March 9, 1983, he broke into the victim's vacant apartment through a window to burglarize the victim's home and to "get her." He soon heard her return and attempted to leave without being seen. However, the victim saw Bolinger so he attacked her. He grabbed her and stabbed her in the upper chest. He then tied

her hands and feet, gagged her, and sexually assaulted her. Afterwards, he took money from her wallet and left.

Bolinger was arrested for another rape and attempted murder. He confessed to committing that crime and two other crimes. He told a psychologist that he killed the victim because she reminded him of his stepmother who had physically abused him.

Bolinger was charged with capital murder, felony murder, aggravated sexual assault, robbery, burglary, and possession of a weapon for an unlawful purpose. He pleaded guilty to felony murder and aggravated sexual assault, and received a term of thirty years with a ten year parole disqualifier.

The AOC coded as present the c(4)(c) (torture or depravity) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and the c(5)(h) (catch-all) mitigating factors.

Bolinger is a Vietnam veteran who was addicted to alcohol and drugs and became intoxicated every day. At the time of the offense, Bolinger was thirty-six-years-old and had been employed for two weeks as a meter reader. He had no prior criminal record.

## B. *State v. Founcill Brockington* *

At around 6:00 a.m. on May 11, 1991, a twelve-year-old boy was awakened by screams. The boy went to his mother's bedroom and from the doorway saw Brockington, nude from the waist down, kneeling on the floor next to the bed, moving in a manner consistent with sexual activity. The boy asked where his mother was, and Brockington said she was sleeping and that the boy should leave. Ten to fifteen minutes later, Brockington left and the boy returned to the bedroom to find his mother dead. He immediately called the police.

The police found the thirty-four-year-old victim lying on the floor next to the bed. Her blue jeans and underwear had been pulled down around her lower left leg. Blood covered her face,

the wall, carpet, and bed sheets. An autopsy revealed that she had been strangled to death.

Brockington was arrested later that day. He confessed that he had a physical confrontation with the victim, struck her in the head with a pointed object, and had sexual contact with her. Brockington was charged with murder, felony murder, aggravated sexual assault, aggravated assault, and possession of a weapon for an unlawful purpose. He pled guilty to aggravated manslaughter and received a twenty-five-year sentence, with an eight-year term of parole ineligibility.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(f) (no significant criminal history) and the c(5)(h) (catch-all) mitigating factors. Brockington was thirty-three years old at the time of the offense.

Although he fathered one child, he is single and lived with his parents at the time of the murder. A high school graduate, Brockington was employed before the arrest, and had no prior criminal record. He claimed to be a regular cocaine user for a year or two up to the time of his arrest.

## C. *State v. Richard Chippero*

On July 23, 1991, twenty-three-year-old Richard Chippero entered the home of his neighbor, thirty-nine-year-old Ermina Tocci, and asked her to have sex with him. Tocci refused, and Chippero pulled out a pocket knife and chased her into the bedroom. He forced her to undress and raped her at knifepoint. Fearing that she could identify him, Chippero stabbed Tocci ten times. She died from the wounds. Chippero subsequently discarded the knife. It was never found.

A partial sneaker print was found on the victim's back. That impression closely resembled the impression from a pair of sneakers found in Chippero's home. Also, vaginal swabs taken from the victim during the autopsy provided evidence of sexual activity, although DNA testing did not conclusively tie the sexual assault to

Chippero. Eventually, Chippero confessed after he had been in police custody for several hours.

Chippero committed the murder only twenty-five days after being paroled from a prison sentence for other serious offenses. He had been previously convicted of aggravated assault, aggravated arson, arson, burglary, and theft.

Chippero's two stepfathers were imprisoned for abusing him. His first stepfather physically abused him and his mother. His second stepfather physically and sexually abused him. When he was seven-years-old, Chippero was diagnosed as being hyperkinetic, emotionally disturbed, and mentally retarded. After graduating from a school for emotionally disturbed students, Chippero was admitted to a psychiatric hospital on four occasions. He was diagnosed with a bi-polar affective disorder and manic behavior.

The jury convicted Chippero of capital murder, felony murder, aggravated sexual assault, hindering apprehension or prosecution, and a weapons offense. The jury found the c(4)(f) (escape detection) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors.

The jury found each of the aggravating and mitigating factors applied, but could not unanimously decide whether to impose the death penalty as a sentence. Chippero was sentenced to life imprisonment with a thirty-year parole disqualifier term on the murder conviction. The court sentenced him to a consecutive life sentence with a twenty-five-year parole disqualifier term for the aggravated sexual assault conviction. Finally, for the hindering apprehension or prosecution count, Chippero received a concurrent five-year term. The remaining convictions were merged for sentencing.

On appeal, Chippero's conviction was set aside by this Court because his confession was the product of an illegal arrest. *State*

*v. Chippero,* 164 *N.J.* 342, 753 *A.*2d 701 (2000). The matter has been remanded for retrial.

## D. *State v. Sharob Clowney*

On the evening of November 11, 1991, police discovered the naked body of Barbara Williams in her apartment with multiple stab wounds and an electrical cord wrapped around her neck. Seated next to her were her five-year-old and nine-year-old sons, Kyshon and Karee. Kyshon sustained thirty-seven stab wounds to his face, neck, chest, stomach, back, arms and legs, while Karee sustained twenty-five stab wounds to his chest and lung. The children managed to live, and later identified Clowney as the killer.

A paramedic estimated that the stabbing occurred fourteen hours earlier, and that Williams died due to blood loss at least twelve hours earlier. Williams had contusions and hematomas consistent with being punched or held, as well as a lip laceration consistent with being punched. Thirty-nine stab wounds punctured her chest, lung, back, diaphragm, and liver. She also had defensive wounds. An autopsy revealed forceful penetration of her vagina and anus.

Karee said that a man came in through the window and stabbed him, his brother, and his mother. He had survived by playing dead. After the man left the apartment, Karee covered his mother with a blanket, and as he did, his mother told him she loved him.

On the day of the murder, Clowney was in the hospital with puncture wounds to his right elbow. He told two friends that he stabbed a woman and her two children, and explained that he was in the apartment exchanging sex for money or drugs. He said that the woman had the knife and they struggled for it. The three went to Williams' apartment before the body was discovered, but were refused entry into the building. His friends convinced

Clowney to turn himself in the next day, and Clowney related his self-defense story.

Kyshon and Karee subsequently identified Clowney in a photo array. Clowney's sperm was found at the scene, and a pair of Clowney's trousers contained Williams's blood. A knife found in Clowney's apartment also contained Williams's blood.

The State did not prosecute Clowney capitally. A jury convicted him of murder, two counts of felony murder, attempted murder (two counts), aggravated sexual assault, and weapons offenses. The court sentenced him to life imprisonment with a thirty-year parole bar for the murder. Clowney was also sentenced to a concurrent nine-year sentence with a four-year parole ineligibility term for the aggravated sexual assault charge. For the first count of attempted murder, Clowney was sentenced to twenty years with a ten-year parole ineligibility term, to run consecutive to the murder charge. For the second count of attempted murder, Clowney was sentenced to another twenty-year term with a ten-year parole ineligibility term, to run concurrent to the first attempted murder sentence, as well as consecutive to the murder count. The other convictions were merged for purposes of sentencing.

The AOC coded as present the c(4)(b) (grave risk of death to another) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors.

At the time of the murder, Clowney was nineteen years old and a drug dealer. He claimed to have sold drugs to the victim on numerous occasions. As an adult, he had a prior simple assault conviction. He also had an extensive juvenile record. He began drinking beer at age eleven, and went on to abuse hard alcohol, marijuana, and cocaine.

Clowney's parents were both alcoholics, and his father abused drugs. His mother once attempted suicide and was diagnosed with adjustment disorder with depressed mood. His mother and

her boyfriend physically and emotionally abused Clowney. She once cooked his pet hamsters in the oven and forced him to kill his dog. Clowney became suicidal like his mother. He made several suicide attempts. He tried to cut his wrists when he was twelve. When he was eighteen years old, he severed his finger but refused to go to the hospital. One year later, he tried to kill himself by drinking bleach. Williams also tried to kill himself in jail after murdering Williams by banging his head against the jail walls. He also burned his arm with cigarettes in order to alleviate his anger. He was diagnosed with intermittent-explosive disorder and borderline personality disorder with anti-social features.

### E. *State v. Jerome Dennis* (1)

On December 1, 1991, Jerome Dennis raped a fourteen-year-old girl at knifepoint, and then stabbed her to death. The girl suffered three stab wounds in the neck, eleven in the chest, and ten in the abdomen. Her ankles and wrists had been bound. Dennis later said that a demon came over him.

Less than two weeks prior to the offense, Dennis had been paroled from Yardville State Prison and admitted into the Intensive Supervision of Probation Program. He had three prior adult convictions for sexual assault, two prior convictions for criminal restraint and one for robbery. In a four-month period, he committed this homicide and four others, including raping and then stabbing another victim as described earlier in this Appendix in *State v. Dennis* (2).

Dennis was charged with murder, but he pled guilty to felony murder for the instant offense. He received a life sentence with a thirty-year parole disqualifier. For the remaining offenses, his aggregate sentence is outlined earlier in this Appendix A as *State v. Dennis* (2).

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and c(5)(h) (catch-all) mitigating factor. Den-

nis completed only the seventh grade and denied any use of drugs or alcohol.

### F. *State v. Ralph Edwards*

On February 11, 1984, Ralph Edwards, an eighteen-year-old male, was walking along the local railroad tracks when he noticed a nine-year-old female on the platform near the tracks. He followed the victim as she went inside an abandoned station. He approached the victim and asked her to sit with him on a mattress which was discarded in the station. He exposed himself to the victim and attempted to sexually assault her. As he turned her on her stomach to rape her anally, the victim managed to knee Edwards in the groin area and run from the station.

Edwards caught up with the victim and used a plastic strap that he had found to restrain her by wrapping it around her neck more than once. When he yanked the strap, the victim fell to the ground and hit her head. She lay motionless. Edwards picked her up and carried her to an area between two track railings. He then went back to the station, retrieved a sheet from the mattress he found in the station and covered the victim's body. Her body was discovered approximately five hours later. The cause of death was strangulation.

Edwards was convicted on April 8, 1984 for receiving stolen property. He was arrested one month later when police officers observed him sexually assaulting a young boy on the railroad tracks about a mile and a half from the murder scene. Edwards confessed to the murder when questioned about the latter sexual offense.

Edwards was charged with murder, felony murder and attempted aggravated sexual assault. A notice of aggravating factors was provided by the State: c(4)(c) (extreme suffering), c(4)(f) (avoiding detection) and c(4)(g) (contemporaneous felony). A jury acquitted him of purposeful murder, but found him guilty of knowing murder and other charges.

Edwards had no prior convictions. Evidence of his history of psychological and mental problems was presented, indicating that he functioned on a mental/emotional level of a nine-year-old.

At the penalty phase, the jury found factors c(4)(f) and c(4)(g) were present. The jury also found the following mitigating factors applied: c(5)(c)(age), c(5)(d)(mental disease), c(5)(f)(criminal history) and c(5)(h) (catch-all factor). Edwards received a life imprisonment sentence, with a thirty-year period of parole ineligibility for the murder count. The felony murder charge merged with the murder charge for sentencing purposes. On the remaining charge, Edwards was sentenced to ten years, with a five-year period of parole ineligibility to be served consecutively to the sentence imposed on the murder count.

## G. *State v. Otis James* *

On May 11, 1994, the police responded to a burglary report. A woman awoke to find Otis James lying on the floor next to her bed. He placed his hand over her mouth, motioned for her to be quiet, and began to fondle her. The woman screamed for her daughter, prompting James to flee through a bathroom window.

While investigating the burglary, police noticed a window in an upstairs apartment was open. The police found a eighty-two-year-old female in the upstairs apartment lying on her bed stomach-down, nude below the waist. Her legs were spread apart and a gel had been spread over her vaginal and anal area. A chair had been pulled up to the bed next to the woman's exposed genitalia. It was determined that the woman had been sexually assaulted and was killed by asphyxia due to smothering and compression of the neck. The police lifted several fingerprints from both apartments that matched James' prints.

James was arrested on September 29, 1995, for the attempted murder of yet another woman. He was identified as the culprit in the May burglary and murder through fingerprints and similarities between the May and September crimes.

James was charged with two counts of burglary, felony murder, murder, two counts of aggravated sexual assault, attempted sexual assault and aggravated criminal sexual contact. He pled guilty to felony murder and was sentenced to life imprisonment with a thirty-year term of parole ineligibility.

The AOC coded as present the c(4)(f) (escape detection) and the c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and the c(5)(h) (catch-all) mitigating factors.

James claimed he was drunk and high when he committed the offense, and only intended to steal money or property to support his drug habit. He claims not to remember sexually assaulting the eighty-two-year-old woman or noticing that she was dead. Despite participating in several substance abuse treatment programs, he abused alcohol and cocaine daily. James apparently started drinking at age five.

James never met his father, and his mother died in a car accident when he was eleven. After his mother's death, James and his two siblings were raised by different relatives. James dropped out of high school after tenth grade. He carried a truck-driving certificate, but was unemployed at the time of the offense. When he was nineteen, James attempted suicide, and was subsequently hospitalized and diagnosed with depression. At the time of the offense, James was twenty-eight-years-old and was living with his sister. He has prior convictions for robbery, burglary, attempted burglary, theft, resisting arrest, disorderly conduct and shoplifting. He was on parole when he committed the murder.

## H. *State v. James Koedatich* (2)

After a night out with friends, Deirdre O'Brien, a female college student, dropped her friends off and drove home at approximately 1:45 a.m. on December 5, 1982.

At approximately 2:10 a.m., a park patrolman found O'Brien's car abandoned on the side of the road with its headlights and

taillights on. The keys were in the ignition and a purse was left on the seat. The patrolman noticed a tire track in the front of the vehicle. The patrolman drove to the victim's residence and found that she had not arrived home.

At 4:26 a.m., New Jersey State Troopers responded to a call from a truck driver at a nearby rest stop that a woman had been stabbed and needed immediate medical attention. A trucker was able to identify the car and the person sitting in the car that had arrived at the rest stop with the injured woman. She screamed and was able to exit the car. The truck driver went to help the victim, noticing that she was bleeding from the chest. Another truck driver made the call to the state troopers. The victim told one of the truck drivers, as well as the troopers that arrived on the scene, that she was forced off the road and was pulled from her car by her assailant.

O'Brien died shortly after arriving at the hospital. She had been stabbed four times in the chest and semen had been found in her mouth and vagina.

At 11:20 p.m. on January 16, 1983, authorities responded to Koedatich's call for medical assistance. When the police arrived at Koedatich's home, he saw Koedatich leaning against the kitchen table with his T-shirt rolled up. His mother was tending a wound on his back. Koedatich told police that he was driving when a car with a blue light pulled his car over. Koedatich claimed to have gotten out of the car, responded to the inquiries of the occupant of the other car, and as he was re-entering his car, he was stabbed in the back. Koedatich was taken to the hospital, and his car, which matched the description of the car that dropped O'Brien off at the rest stop, was taken to the police garage.

Evidence linked Koedatich to the stabbing of O'Brien. A forensic chemist testified that paint particles found in Koedatich's car were found on the victim's clothing. An expert testified that the snow tires found on Koedatich's car matched the tire marks found at the scene of the kidnaping. Another witness testified

that there was a correlation between the fibers found on Koedatich's seat cover and those found on the victim's clothing. Also, it was determined that Koedatich's stab was self-inflicted.

Defendant was charged with murder, felony murder and kidnaping. A notice of aggravating factors was served: c(4)(a) (prior murder), c(4)(c) (extreme suffering), c(4)(f) (escaping detection), and c(4)(g) (contemporaneous felony). Defendant was found guilty on all counts.

Koedatich had a long, violent criminal history dating back to his childhood. In 1971 he was convicted of murder by a Florida court. He was free for approximately four months when he killed O'Brien. Approximately a week before O'Brien's murder, he kidnaped an eighteen-year-old girl as she was leaving work. He sexually assaulted and murdered that girl. For that murder, he was sentenced to death. The conviction was upheld, but was remanded for a new sentencing proceeding. *State v. Koedatich,* 112 *N.J.* 225, 548 *A.*2d 939 (1988).

At the penalty trial for the murder of O'Brien, his sister-in-law testified that Koedatich was very respectful and close with his family. His girlfriend also testified favorably as to his disposition. In addition, a sociologist was permitted to testify about witnessing a death by lethal injection and about the pros and cons of the death penalty.

The jury found that aggravating factors c(4)(f) and c(4)(g) applied. The jury also found that mitigating factor c(5)(h) (catchall) applied. Koedatich was sentenced to life with a thirty-year period of parole ineligibility on the murder count. He was also sentenced consecutively to thirty years with a fifteen-year period of parole ineligibility for the kidnaping count.

I. *State v. Mark Luciana* *

On the evening of June 27, 1987, nineteen-year-old Mark Luciana attended a party with a fifteen-year-old female and three other friends. Later the group left to go swimming at a nearby wooded

area. When they arrived, Luciana and the fifteen-year-old walked into the woods, where Luciana sexually assaulted her and strangled her. Afterward, Luciana rejoined his friends and told them that the victim had left to go to the bathroom. Eventually, Luciana drove two of the friends home, and one friend remained in the car passed out.

Luciana then drove back to the crime scene, put the victim's body in the trunk, and drove to a hotel. When Luciana's friend awoke the next morning, Luciana showed him the body in the trunk. Because the car would not start, Luciana and his friend left it at the hotel and returned home. Within a few days, Luciana's friend told police about the body and Luciana turned himself in.

Police received information that further implicated Luciana's involvement in the murder. His ex-girlfriend stated that Luciana became violent after drinking and being refused sex. Luciana's cellmate also indicated that Luciana indicated that he received sexual gratification from the murder of the fifteen-year-old, as well as from inflicting pain upon other partners during sexual encounters.

Luciana was charged with purposeful or knowing murder, felony murder, aggravated sexual assault, hindering apprehension and endangering the welfare of a child. The State asserted aggravating factors c(4)(c) (extreme suffering), c(4)(f) (escape detection), and c(4)(g) (concurrent felony). The defense asserted mitigating factors c(5)(a) (emotional disturbance), c(5)(c)(age), c(5)(d) (mental disease or defect or intoxication), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all). A jury found Luciana guilty on all counts.

At the penalty phase, the defense presented evidence that Luciana dropped out of high school after ninth grade, but later received his GED and attended classes at a community college. At the time of the murder, he was employed in his step-father's paving business. There was evidence that Luciana had both an

alcohol and drug problem and was subject to physical and emotional abuse as a child. A defense psychologist suggested that Luciana was very immature for his age and had an anti-social personality disorder stemming from neglect as a child. Luciana testified, as did the psychologist, that he was intoxicated from eighteen beers and marijuana at the time of the killing, although this was not consistent with other witnesses' testimony. Luciana also stated that he feels little empathy for those around him. Yet, he tearfully testified that he could not undo the terrible thing he did, that he did not mean to kill the victim, that he was truly sorry, and asked the jury to spare his life. Luciana has one prior conviction from 1986 for drug possession and receiving stolen property.

The jury found aggravating factors 4(f) and 4(g) and mitigating factors 5(c), 5(d), 5(f) and 5(h). They were unable to reach a decision regarding the weighing of those factors, so Luciana was sentenced to life imprisonment with a thirty-year period of parole ineligibility for the murder. He received an aggregate consecutive sentence of nineteen years imprisonment for the remaining charges.

### J. State v. Rasheed Muhammad

On the afternoon of April 1, 1995, Jakiyah McClain, an eight-year-old, went to visit a friend, Ah–Tavia Maxey, who lived a few blocks away. As Jakiyah and Ah–Tavia were walking upstairs to Ah–Tavia's apartment, Muhammad entered the apartment building and volunteered to walk Jakiyah upstairs. Muhammad knew Ah–Tavia's mother. Ah–Tavia did not go upstairs, but instead watched as Muhammad took Jakiyah's hand and led her upstairs. Shortly thereafter, Ah–Tavia heard someone kicking and banging, and she also heard Jakiyah's screams.

When Jakiyah never returned home that night, her mother began searching for her, and eventually filed a missing person report. The next day, the police discovered that Muhammad was granted permission to stay in an abandoned apartment of the

building where Jakiyah was last seen alive. The police knocked on the door of that apartment and Muhammad let them enter. The police found the little girl's body in the bedroom closet of the apartment, curled in a fetal position with her underpants around one ankle. Ah–Tavia identified Muhammad as the person last seen with Jakiyah.

Muhammad confessed to kidnaping, sexually assaulting and murdering Jakiyah. The cause of death was determined to be asphyxiation. An autopsy confirmed that she had been sexually assaulted.

Muhammad was charged with capital murder, kidnaping, burglary, two counts of aggravated sexual assault and felony murder. The burglary charge was dismissed. A jury convicted him of the remaining charges.

During the penalty phase, the State alleged that the following aggravating factors were present: c(4)(f) (avoid detection), c(4)(g) (murder committed during the course of a sexual assault and a kidnaping), c(4)(k) (victim was less than fourteen-years old). Muhammad alleged that nineteen separate c(5)(h) (catch-all) factors were present. Evidence was presented concerning his childhood years during which he was neglected by his parents, exposed to his parents' drug and alcohol problems and sexually abused. He also witnessed his father stabbing his mother. He was abused by his parents and his mother's paramour. He also was institutionalized because neither parent would take custody of him. He began abusing drugs by age twelve and suffered several head injuries. There was documentation of two suicide attempts.

The jury found the c(4)(g) and c(4)(k) aggravating factors were present, as well as each mitigating factor. The jury could not unanimously agree on punishment. Muhammad was sentenced to a term of life imprisonment with no parole. He received a consecutive fifty-year sentence for the kidnaping charge, with a twenty-five-year term of parole ineligibility. The remaining convictions were merged.

### K. *State v. Walter B. Norris*

On March 26, 1996, an apartment complex security guard called the police to report that he had discovered a naked woman lying on the ground bleeding. Prior to discovering that, the guard had noticed a man kicking the woman. When the guard approached, the man ran away.

When the police arrived, they found a condom located near the scene of the crime. From marks on her body, police could tell that she had been dragged to the location where she was sexually assaulted and beaten. She was immediately transported to a hospital, but she died at the hospital because of multiple injuries and bruises to her face and head.

Based on the security guard's description, police arrested Norris. He was charged with murder and three counts of aggravated sexual assault. A jury convicted him of aggravated manslaughter and he was sentenced to a thirty-year term with fifteen years of parole ineligibility. The remaining charges were dismissed for sentencing purposes.

Norris was twenty-eight years old at the time of the offense. He lived with his mother and worked as a security guard and deliveryman. He had a history of mental illness and had been institutionalized in 1995 for two weeks.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(d) (mental disease or defect or intoxication) and c(5)(h) (catch-all) mitigating factors.

### L. *State v. Gerald Williams* *

On April 13, 1994, the victim's mother was notified by the victim's place of employment that she had not reported to work that day. She went to her daughter's apartment and found her lying on her stomach. She was nude and her right wrist and left ankle were tied with a rope. She called the police.

The autopsy revealed that the victim died from strangulation and that she was sexually assaulted both vaginally and anally. A

small white vase and a bottle of body oil were used to assault the victim. Williams' thumbprint was found on the bottle. He also had an unusual gene that matched semen samples taken from a sock found at the scene of the crime.

Williams, a thirty-eight-year-old male, had been employed in the victim's apartment building for approximately four months. He was fired in February 1994 and began living in vacant apartments and stairwells in the complex.

Williams claimed that he had had an affair with the victim. He also asserted and that he was not involved in the murder. He had prior convictions for robbery and assault. He also had a history of depression. At the time of his arrest, he claimed to have been daily using cocaine and alcohol for fifteen years.

Williams was charged with murder, felony murder, burglary, two counts of aggravated sexual assault, criminal restraint, unlawful possession of a weapon and possession of a weapon for an unlawful purpose. He was convicted by a jury on all counts.

Williams received a life sentence with no parole for the murder count. Williams also was sentenced to a consecutive fifty-year term with a twenty-five-year term of parole ineligibility for the kidnaping charge. The remaining convictions were merged for purposes of sentencing.

COLEMAN, J., dissenting.

I voted previously to set aside the capital conviction and sentence of death because of pretrial and mid-trial publicity. *State v. Harris,* 156 *N.J.* 122, 211–230, 716 *A.*2d 458 (1998). The AOC has assigned this case to the D–2 sub-category for non-aggravated sexual assault killings because, in its view, this case does not contain extreme brutality, when viewed in the relative context of other sexual assault killings. The victim was over the age of 14 and suffered only a single fatal wound with no contributing injuries except the second shot that was fired after obtaining the shovel. There are eleven other cases in the D–2 category. Defendant is the only one to get the death penalty. Even prosecu-

tors deem the D–2 cases less deathworthy. Given those facts, I dissent from the Court's holding and conclude that defendant's sentence of death was influenced by the pretrial and mid-trial publicity and is, therefore, aberrational. *Harvey III, supra,* 159 *N.J.* at 319, 731 *A.*2d 1121; *Cooper II, supra,* 159 *N.J.* at 115, 731 *A.*2d 1000. I would vacate the sentence of death and remand for a new penalty trial.

LONG, J., dissenting.

I believe that because Ambrose Harris's death sentence was impermissibly influenced by extensive, adverse publicity prior to and during his trial, meaningful proportionality review is impossible to conduct. Because the majority holds otherwise, I dissent.

I.

Local news coverage of Harris's case was massive and intense. The coverage began during the initial disappearance of the victim, Kristin Huggins, in December 1992, lasted throughout the trial, and continued even during the appeal. The local newspaper is well known for its colorfully unsympathetic treatment of criminals, but it singled out Harris for particularly inflammatory treatment; its coverage of his case was out-of-proportion to its coverage of any other capital defendant. Even the trial court stated that Harris was "the most publicly despised criminal that this Court can recall."

In different articles, the local newspaper referred to Harris as a monster, a beast, a wild animal, and a "useless savage." On February 24, 1993, the newspaper's cover was a large picture of Harris next to the giant headline: "Profile of a MONSTER," and in smaller type, "The Man Who Killed Kristin Huggins Committed His First Rape as a Teenager." The front section story was juxtaposed next to a half-page picture of Harris and the large caption: "From Boy to Beast." Another bold headline ran: "I Don't Think He's a Man," quoting the victim's mother. Another article on February 21, 1993, featured a large mug shot of Harris

next to the headline: "Huggins Suspect 'Would Kill You in a Heartbeat.'"

Even more disturbing is the newspaper's heated calls for the immediate execution of Harris without a trial. Editorial responses to readers' spoken opinions in a section known as "BackTalk" are particularly striking. Under the headline "Bring Back Hangings," one reader called for a public hanging of Harris on Trenton High School's football field, and suggested that: "[W]e can invite everybody from all around to see what happens to people who don't care about other people. Why not give it a shot? I'll pay for the rope!" The newspaper's response was: "Nice try, but I was the first to offer to pay for the rope. You can buy lumber for the gallows, though." The newspaper also ran the headline "KILL HIM" in one-and-a-half inch bold type next to Harris's picture on the cover of the June 10, 1994, paper. On the first day of jury deliberations in the penalty phase, the headline on the editorial page ran: "Death for Harris." [1]

During the trial, jurors were not sequestered and were likely to see the local newspaper headlines in stands located around the courtroom and along the juror bus route. The trial court denied Harris's motion for a change of venue and responded to the publicity instead by making limited inquiries during *voir dire* whether jurors had been exposed to the newspaper coverage. The trial court, however, did not fully explore the effect of the publicity on the jurors who read it. Nor did the trial court inquire about whether any jurors had learned of Harris's criminal history, about which they would not have otherwise known, from the publicity. The trial court refused to reroute the juror bus to avoid exposure to the newspaper stands, to require the jury to remain in

---

[1] For a full account of the newspaper coverage and selected reprints, see *State v. Harris*, 156 *N.J.* 122, 202–10, 212–18, 716 A.2d 458 (Handler, J., dissenting). *See also* Harris N. Feldman, *Free Press vs. Fair Trial in New Jersey: Capital Appeals based on Prejudicial Media Publicity*, 31 *Rutgers Law J.* 209 (1999) (discussing adverse publicity claims in *State v. Harris* and *State v. Timmendequas* ).

the jury room during lunch, to sequester the jury during the penalty phase, and to *voir dire* the jurors individually about the publicity during the penalty phase while inflammatory publicity about the case continued.

The trial court, Appellate Division, and this Court agreed that, in light of the volume, intensity, and virulence of the publicity, there was a presumption of prejudice. *State v. Harris*, 156 *N.J.* 122, 145, 716 *A.*2d 458 (1998) (*Harris I*); *State v. Harris*, 282 *N.J.Super.* 409, 413–15, 660 *A.*2d 539 (App.Div.1995). However, those courts ultimately concluded that no actual prejudice resulted from the publicity because the trial court took adequate remedial measures to counteract the potential effect of the publicity. *Harris I, supra*, 156 *N.J.* at 146, 153–54, 716 *A.*2d 458. It is obvious to me that Harris suffered actual prejudice. The publicity was scathing, calculated to influence the jury, was likely to have reached one or more of the jurors, and was not met by serious efforts to minimize the prejudice. Accordingly, I must concur with Justice Handler's conclusion that, "the pervasive pretrial and midtrial publicity that surrounded this prosecution created a realistic likelihood that defendant would not receive a fair trial," and that, "[t]he precautions taken by the trial court to overcome that publicity were woefully inadequate to assure a fair trial." *Harris I, supra*, 156 *N.J.* at 218, 716 *A.*2d 458 (Handler, J., dissenting).

## II.

Precedent-seeking review, the most significant method of measuring proportionality, *State v. Loftin*, 157 *N.J.* 253, 335, 724 *A.*2d 129 (*Loftin II*), *cert. denied*, 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999), is largely based upon aggravating and mitigating factors found by the penalty phase jury. Because Harris's penalty phase jury was most likely influenced by the local newspaper's scathing publicity, we cannot rely on its findings. Without accurate and reliable findings concerning aggravating and mitigating circumstances, it is simply impossible to compare Harris's case with other cases to determine his relative culpability. All that we

can hope to accomplish in Harris's proportionality review is to assess his moral culpability in the abstract, without reference to other cases or our established standards for comparative culpability. That is an unacceptable means to "administer the most extreme penalty in a fair and consistent manner." *Loftin II, supra,* 157 *N.J.* at 279, 724 *A.*2d 129.

I, therefore, dissent.

*For affirmance*—Chief Justice PORITZ and Justices O'HERN, STEIN and LaVECCHIA—4.

*To vacate and for remandment*—Justices COLEMAN and LONG—2.